COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | |
|---|---|---|
| CLAIRE STANARD PHILLIPS, | | No. 08-06-00171-CV |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | 302nd District Court |
| | § | |
| TROY D. PHILLIPS, | | of Dallas County, Texas |
| | § | |
| Appellee. | | (TC # DF03-22213-U) |
| | § | |

**O P I N I O N**

Claire Stanard Phillips appeals from a final decree of divorce. While she brings several issues for review, her primary complaint is the trial court's decision to offset reimbursement claims against a $404,407 constructive fraud award for economic torts committed against the community estate.

**FACTUAL SUMMARY**

Claire and Troy Phillips married on February 1, 2001. Each brought a significant separate estate into the marriage. The couple separated in November 2003 and Troy filed for divorce on December 29, 2003. Claire answered and filed a counter-petition, alleging fault grounds. Her live pleadings at trial sought a disproportionate division of the community estate and she asserted claims for (1) constructive fraud, (2) reimbursement, (3) economic contribution, and (4) attorneys' fees. She also joined Troy's law firm -- Glast, Phillips & Murray (which we refer to as GPM) -- and alleged theories of alter ego. Finally, she filed a personal injury claim against Troy for assault.

Trial of this matter was bifurcated. During a pretrial hearing in December 2004, the trial judge advised counsel that she intended only to submit characterization issues to the jury, as all other

contested issues at that point in time were purely advisory. Claire filed amended pleadings on April 20, 2005, and the jury trial began on May 16.[1] Following a five day trial, the jury found that Troy had committed constructive fraud against the community estate and that Claire's one-half interest in the community had been short-changed in the amount of $404,407. The jury found against Claire on the assault and reimbursement claims, characterized two assets as Troy's separate property, and determined that Claire should pay all of Troy's attorneys' fees in the total amount of $112,357. Issues related to economic contribution and alter ego were not submitted.

The trial court then conducted a two-day bench trial in September 2005. Claire's emergency motion for continuance was denied, and she absented herself from trial on September 8. She was present to testify on September 9. The trial judge considered additional claims for reimbursement which had not been submitted to the jury, additional characterization issues, offsets and credits, and the ultimate division of the community estate. Claire's counsel[2] did not object when Troy introduced evidence pertaining to his claims for offset and introduced additional evidence pertaining to her reimbursement claims. The trial court determined that Troy had paid from his separate estate (1) $38,000 to Claire's separate estate; and (2) $128,825 to the community estate. The court also found that the community had expended $35,977 for the benefit of Claire's separate estate. Additionally, Troy had, since the jury trial, made payments for Claire from his separate property in the amount of $9,950.34. Claire had also made unauthorized charges to Troy's credit cards in the amount of $9,894.80.

---

[1] During the pretrial phase of this case, Claire was represented first by Amy Ganci and then by Linda Aland while Troy was represented by Thomas Raggio. During the jury trial, Claire was represented by Mary McKnight, Neal Young, and Patricia Jordaan. Troy was represented by Charles Wilson.

[2] During the bench trial, Claire was represented by Stephen Shoultz, who had not participated in the jury trial.

In the final decree, the trial court accepted the jury's findings and rendered judgment that Troy committed fraud on the community estate and that he owed $404,407 on this claim, subject to other awards and offsets. The trial court ordered that the parties' home (the Degas residence) would be sold and that each spouse would be paid $125,000 representing separate property contributions utilized to purchase the residence. The monies owed to Claire would be paid from the sale proceeds. Findings of fact and conclusions of law were filed. Claire sought additional and amended findings, but the trial court did not act on her request, and no error has been assigned in that regard.

Claire brings five issues for review, each with a multitude of sub-issues. Her statement of facts encompasses eighteen pages and seventeen alphabetically identified complaints, two of which are not included within her issues for review, nor are they briefed. First, the pleadings, the evidence, and all of counsels' arguments relating to the assault specified that the alleged incident occurred on August 4, 2004. But the jury question, prepared and tendered by Claire's counsel, contained a typographical error such that the question inquired whether an assault occurred on August 4, 2005. The Final Decree of Divorce, in reciting the jury's findings, used the proper date of August 4, 2004. Claire has not assigned error or briefed the issue, but asks her in prayer for relief that we correct the decree to reflect that "no assault occurred on August 4, 2005," which, of course, post-dates the trial. This issue has not been preserved for our review. Moreover, the error is her own.

Second, she complains that her emergency motion for continuance was denied because the trial court believed an earlier continuance which had delayed the bench trial was a direct result of Claire leaving town without notice. Claire insists this was inaccurate information and she filed a motion to correct the error in the record. The trial court denied this request as well. As she has not assigned error or briefed the issue, we decline to consider it. We turn now to those issues which have been briefed.

**CREDITS AGAINST THE CONSTRUCTIVE FRAUD JUDGMENT**

In her first issue, Claire contends that the trial court erred in reducing the constructive fraud judgment by $141,085, representing Troy's offset and reimbursement claims. She complains that because Troy failed to submit jury questions, the court could not make fact findings in his favor on claims urged during the bench trial, nor could it offset those claims against the constructive fraud judgment. Alternatively, she argues that the jury found Troy was not entitled to credit for his reimbursement claims. Claire additionally argues that Troy is judicially estopped from asserting his reimbursement claims because he judicially admitted that he was not seeking reimbursement. Finally, she maintains that Troy was allowed reimbursement for community living expenses.

*The Nature of Reimbursement*

The rule of reimbursement is purely an equitable one. *Vallone v. Vallone*, 644 S.W.2d 455, 458 (Tex. 1982); *Lucy v. Lucy*, 162 S.W.3d 770, 776 (Tex.App.--El Paso 2005, no pet.). It is not an interest in property or an enforceable debt, *per se*, but an equitable right which arises upon dissolution of the marriage through death, divorce, or annulment. *Lucy*, 162 S.W.3d at 776. An equitable right of reimbursement arises when the funds or assets of one estate are used to benefit and enhance another estate without itself receiving some benefit. *Id.* A claim for reimbursement includes payment by one marital estate of the unsecured liabilities of another marital estate. TEX.FAM.CODE ANN. § 3.408(b)(1)(Vernon Supp. 2008). The trial court resolves a claim for reimbursement by using equitable principles, including the principle that claims for reimbursement may be offset if the court determines it to be appropriate. TEX.FAM.CODE ANN. § 3.408(c). Benefits for the use and enjoyment of property may be offset against a claim for reimbursement for expenditures to benefit a marital estate on property that does not involve a claim for economic contribution to the property. TEX.FAM.CODE ANN. § 3.408(d). The party seeking reimbursement

has the burden of pleading and proving that the expenditures and improvements were made and that they are reimbursable. *Vallone*, 644 S.W.2d at 459.

*Evidence Related to Reimbursement Issues*

By their pleadings, both parties sought reimbursement. While Claire offered evidence in support of her claims for reimbursement and submitted jury questions relevant to those claims, Troy took a different approach. He offered evidence in support of his reimbursement claims, but he informed the jury throughout trial -- beginning in opening statement -- that he did not want Claire to reimburse him for these expenditures. Instead, he wanted a "credit" against any reimbursement awarded Claire by the jury. In his opening statement, Troy's attorney stated:

> You're going to see exhibits that this man had property before he married this lady, and he spent more than $200,000 of those funds to help her and the community. We're not asking for any of that back. It's money he spent in his marriage. We're accepting that fact. It's gone.

> \* \* \* \* \* \* \* \*

> [W]e're not trying to get back everything we put into this marriage.

During Troy's testimony, counsel introduced Petitioner's Exhibit 44, which sets forth the money expended from Troy's separate estate to Claire's separate estate ($38,000), money expended from Troy's separate estate to the community ($128,825), and money expended from the community to Claire's separate estate ($35,977.01). These expenditures total $202,802.01. When asked whether he wanted to recoup any of the money his separate estate paid to the community, he answered, "No." Likewise, counsel questioned him about the community expenditures for Claire's separate estate:

> [Mr. Wilson]: Mr. Phillips, with respect to this total that you list here as from community to her separate property, are you asking that Mrs. Phillips be required to repay any of that?

> [Troy]: **I don't want anything from Claire**. **I don't want to have to pay her anything**. I don't care. Just -- I want out. Just let me out. [Emphasis added].

After continuing to review the expenditures in detail, counsel asked one more question regarding Troy's desire for reimbursement:

[Mr. Wilson]:  Are you asking for any of this --

[Troy]:  No.

[Mr. Wilson]:  -- this money from your separate or community to be paid back to you?

[Troy]:  No.

Claire did not dispute that Troy had made the payments shown in Petitioner's Exhibit 44 except for a $25,000 payment from Troy's separate estate used to open a joint account, and she did not know the source of two other payments shown on the exhibit.  Significantly, she admitted that Troy was not seeking reimbursement for these expenditures, but that he wanted an offset.

The court's charge submitted five jury questions regarding Claire's reimbursement claims. Questions Four through Seven asked what amount of money Troy's separate estate owed to the community estate for:

(Question 4) credit card payments made for corporate items;

(Question 5) gambling debts;

(Question 6) money expended on Troy's separate property, the Portsmouth residence;

(Question 7)  dues and expenses at Preston Trail Country Club.

Finally, Jury Question Eight asked the following:

State in Dollars, if any, the amount of the offset against such reimbursement claims, if any, proved to benefit-

1.  Troy D. Phillips' separate estate

2.  The community estate.

The charge correctly defined offset as that term applies to a claim for reimbursement for

funds expended by an estate to pay debts, taxes, interest, or insurance for the property of another estate. Offset is measured by "the value of any related benefit received by the *paying estate*, . . . income received by the paying estate from the property, and any reduction in the amount of any income tax obligation of the paying estate by virtue of the paying estate's claiming tax-deductible items relating to the property, such as depreciation, interest, taxes, maintenance, and other deductible payments." [Emphasis added]. The charge also defined offset as that term applies to a claim for reimbursement of funds expended by an estate for improvements to real property of another estate, i.e., the Portsmouth residence. In that instance, offset is measured by "the value of any related benefit received by the paying estate, such as the fair value of the use of the property by the paying estate, income received by the paying estate from the property, and any reduction in the amount of any income tax obligation of the paying estate." *See* TEX.FAM.CODE ANN. §3.408(d).

During final argument, Troy's attorney stated:

In the charge you're, in fact, asked first in Question Number 8, Should there be an offset against any claims for reimbursement? Remember that Mr. Phillips said, I'm not asking you to make her pay me back this money. That was my money before marriage. I spent it on us. And you know what? He's not asking for it back.

He put money in her IRA. He's not asking for it back. He put money in the community checking account. He's not asking for it back.

She took money out of the checking account, closed it out, in fact, and put it in her special separate account. We're not asking for it back, **but we are saying it's a credit. If we're going to play this ridiculous game of reimburse me for things then on Question Number 8 we should get reimbursed -- get credit for this amount.**

**We're not asking for this money. You're not going to give us this money. You're just going to say we get credit for what we've paid. That's what goes in Number 8. So there will be two boxes there, one for the community, which is Number 1, and then one for Mr. Phillips which is the remaining amounts.** [Emphasis added].

Again, we're not asking that Claire Phillips be required to pay us a dime, but we

don't want to be mistreated going in the other direction.

*What Does Question 8 Mean?*

Troy argues that Question Eight relates only to an offset against Claire's reimbursement claims and that we must presume the jury followed the law as set forth in the charge. As we have noted, the jury was asked to "[s]tate in Dollars, if any, the amount of the offset against such reimbursement claims, if any, proved to benefit" (1) Troy D. Phillips' separate estate and/or (2) the community estate. The issue is whether the phrase "proved to benefit" modifies "offset" or "reimbursement claims." If the phrase modifies "reimbursement claims," the jury was asked to determine the amount of the offset against those reimbursement claims which benefitted Troy's separate estate. Under this interpretation, the first part of the question pertained to Claire's reimbursement claims alleging that an expenditure of community funds benefitted Troy's separate estate. The jury answered zero. Similarly, under this interpretation, the jury was asked in the second part of the question to determine the amount of the offset against those reimbursement claims which benefitted the community estate. Claire did not have any reimbursement claims against the community estate. But Troy presented evidence (Petitioner's Exhibit 44) that his separate estate had expended $128,825 to benefit the community. By answering this question zero, the jury found there was no offset against Troy's reimbursement claims at least with respect to the community estate. Under this interpretation, Question 8 does not address Troy's reimbursement claims based on an expenditure by his separate estate for Claire's separate estate in the amount of $38,000, or his reimbursement claims based on an expenditure by the community which benefitted Claire's separate estate ($35,977.01).

Question 8 is subject to another interpretation if the phrase "proved to benefit" modifies "offset." Under this interpretation, Question 8 focused on the benefit received by the paying estate

which is consistent with the definition of offset provided in the court's charge. All four of Claire's reimbursement claims pertained to an expenditure of community funds to benefit Troy's separate estate. In other words, she sought to have Troy's separate estate reimburse the community estate. In that instance, Troy would be entitled to offset against those reimbursement claims the value of any benefit received by the paying estate, namely, the community estate. Consistent with this definition of offset, the second part of Question 8 asked the jury to determine the value of the benefit which the community estate (the paying estate), received from the expenditures. Under this interpretation, Question 8 also asked the jury to determine what benefit Troy's separate estate received from the expenditures. The bulk of Troy's reimbursement claims related to expenditures by his separate estate to benefit Claire's separate estate ($38,000) and the community estate ($128,825). Thus, Claire would be entitled to offset against these reimbursement claims the value of the benefit received by Troy's separate estate. Consistent with this definition of offset, Question 8 also asked the jury to determine the value of the benefit received by Troy's separate estate.

We believe the purpose of Question 8 was to determine the amount of the offset to be applied against all of Claire's reimbursement claims and the offset against Troy's separate estate's reimbursement claims. This interpretation is more consistent with the trial court's instructions and definitions. Thus, we conclude that the phrase "proved to benefit" modified "offset." The jury answered zero to Claire's reimbursement claims in Questions 4 through 7 and, by answering zero to both parts of Question 8, determined that neither party was entitled to an offset against reimbursement claims.

During the subsequent bench trial, Troy sought an offset of $141,086.14 against the $404,407 which the jury awarded for his constructive fraud:

1. $64,412.50 -- one-half of $128,825 expended from Troy's separate estate to the

community;

2. $17,988.50 -- one-half of $35,977.01 expended from the community to Claire's separate estate;

3. $38,000 -- money expended from Troy's separate estate to Claire's separate estate;

4. $9,950.34 -- post-jury verdict payments from community estate for community liabilities;

5. $840 -- medical reimbursement check payable to Troy but endorsed by Claire; and

6. $9,894.80 -- unauthorized charges on credit cards by Claire.

The trial court granted Troy an offset in the amount of $141,085.

*Necessity of Obtaining Jury Findings*

Claire complains that Troy waived his reimbursement claims because he did not obtain jury findings on them. Rule 278 of the Texas Rules of Civil Procedure requires the trial court to submit to the jury those instructions and definitions raised by the written pleadings and the evidence as are necessary to enable the jury to render a verdict. TEX.R.CIV.P. 278; *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992). On appeal, all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted or requested are waived. TEX.R.CIV.P. 279; *see T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 222-23 (Tex. 1992).

Troy doesn't contend that he conclusively established his reimbursement claims, nor does the record support such a conclusion. It is undisputed that Troy did not submit jury questions related to his reimbursement claims. While the trial court submitted the offset question in Question 8, offset is not an element of a reimbursement claim. Nevertheless, Claire did not object when Troy presented

his reimbursement evidence at the non-jury portion of the trial.[3] Because we conclude that the reimbursement claims were tried by consent, the court did not err by offsetting the constructive fraud judgment by $141,085.

*Judicial Estoppel and Judicial Admission*

Alternatively, Claire maintains that the doctrines of judicial estoppel and judicial admission bar Troy's claims for offset. The doctrine of judicial estoppel "precludes a party from adopting a position inconsistent with one that it maintained successfully in an earlier proceeding." *Pleasant Glade Assembly of God v. Schubert,* 264 S.W.3d 1, 6 (Tex. 2008), *citing* 2 Roy W. McDonald & Elaine G. Carlson, TEXAS CIVIL PRACTICE § 9.51 at 576 (2d ed.2003). Contradictory positions taken in the same proceeding may raise issues of judicial admission but do not invoke the doctrine of judicial estoppel. *Id., citing Galley v. Apollo Associated Servs., Ltd.,* 177 S.W.3d 523, 529 (Tex.App.--Houston [1st Dist.] 2005, no pet.)("Judicial estoppel does not apply to contradictory positions taken in the same proceeding"). While this trial was bifurcated, it was one proceeding.

We also disagree that Troy's testimony during the jury trial was a judicial admission. A party's testimonial declarations that are contrary to his position are considered "quasi-admissions." *Duncan v. F-Star Management, L.L.C.,* ---- S.W.3d ----, 2008 WL 3872869 (Tex.App.--El Paso Aug. 21, 2008) at *6, *citing Mendoza v. Fidelity & Guar. Ins. Underwriters, Inc.,* 606 S.W.2d 692, 694 (Tex. 1980). Quasi-admissions are distinct from true judicial admissions, which are formal waivers of proof usually found in pleadings or the stipulations of the parties. *Id.* A quasi-admission will be treated as a judicial admission only if: (1) the declaration was made during the course of a judicial proceeding; (2) the statement is contrary to an essential fact embraced in the declarant's

---

[3] Our resolution of this issue should not be interpreted as condoning the somewhat haphazard method of submitting some reimbursement issues while not submitting others.

theory of recovery or defense; (3) the statement is deliberate, clear, and unequivocal; (4) giving conclusive effect to the declaration will be consistent with public policy; and (5) the statement is not destructive of the opposing party's theory of recovery. *Mendoza,* 606 S.W.2d at 694.

First, Troy's statements during the bench trial were consistent with the position he took before the jury. He didn't want Claire to "pay" him, but he certainly wanted an offset against whatever relief she obtained. In Jury Question 8, he sought an offset against the reimbursement claims Claire submitted. Because Claire did not recover on her claims of reimbursement, Troy received no offset to those claims. Then during the bench trial, Troy sought an offset against the constructive fraud judgment.

Second, even a judicial admission is waived when evidence contrary to the purported admission is heard without objection on that ground. *Duncan*, 2008 WL 3872869 at *6, *citing Field v. AIM Mgmt. Group, Inc.,* 845 S.W.2d 469, 473 (Tex.App.--Houston [14th Dist.] 1993, no writ); *Indus. Disposal Supply Co., Inc. v. Perryman Bros. Trash Serv.,* 664 S.W.2d 756, 764 (Tex.App.-- San Antonio 1983, writ ref'd n.r.e.). Claire's counsel lodged no objection.

### *Nature of the Offsets*

Next, Claire insists that Troy was compensated for separate monies used to pay community living expenses in violation of the Texas Family Code and *Pelzig v. Berkebile*, 931 S.W.2d 398, 400 (Tex.App.--Corpus Christi 1996, no writ). Troy responds that he established by his testimony and by Petitioner's Exhibit 44 that the funds for which he sought credits against the constructive fraud judgment had not been expended for living expenses. He claims that while Claire testified to her version of the purpose of the payments, the trial court was free to accept Troy's accounting.

Petitioner's Exhibit 44 contains forty pages of bank records, cancelled checks, and charts. It is divided into three categories: contributions from the community estate to Claire's separate estate

($35,997.01); contributions from Troy's separate estate to Claire's separate estate ($38,000); and contributions from Troy's separate estate to the community estate ($128,825). Although Claire challenges the propriety of the total offsets against the constructive fraud judgment, she does not contend that the monies in categories one and two were not paid. Her arguments address category three. Here is Troy's explanation which was offered during the jury trial:

> [Mr. Wilson]   Let me hand you what I have marked as Petitioner's Exhibit 44. . . .
> Can you tell me what that is, sir?

> [Troy] It is a schedule of -- prepared with backup of checks and other evidence supporting the transaction of money that had gone -- it's in three categories. Category 1 is from my community -- from our community to Claire's separate, from my separate to Claire's separate and from my separate to the community.

> \* \* \* \* \* \* \* \*
> [Exhibit Admitted]

> Q:      Mr. Phillips, go with me to the third column, the third grouping, from Troy's straight to the community. Is this a specific item-by-item listing of the monies that came from your separate property funds, that $500,000 we talked about, that went into the community that you gave to your marriage?

> A:      Yes.

> Q:      Now, I notice there are -- it says $100,000 Gateway joint, and then there's parentheses below that?

> A:      Yes.

> Q:      What is that?

> A:      The $100,000 was my separate property that went into the joint account. Our tax bill for the preceding year, $67,000, came out of it. I deducted the amount that went to the IRS, so that $67,000 is not included in the total.

> Q:      So the numbers in the parentheses are not included in the total?

> A:      They're subtracted from -- yeah, they're subtracted from.

> Q:      So the $128,825 is the net that you were able to trace from your separate estate just

as gifts to the community?[4]

A:    $128,825 went from my separate property into the community to be used by the community.

Q:    Are you asking for any of that money back?

A:    No.

During the bench trial, Petitioner's Exhibit 44 was revisited. Troy then offered Petitioner's Exhibit 91, which was a schedule of payments he had made on Claire's behalf following the conclusion of the jury trial. He testified that the total payment was $9,950.34 and that the advances were mostly "house" related. Exhibit 92 reflected a check issued by the law firm's insurance carrier payable to Troy in the amount of $840. The check was mailed to the Degas home, endorsed by Claire, and deposited into her personal bank account. Exhibit 93 included three credit card statements from MBNA issued to Troy. Troy testified there were no other signatories to the account and Claire was not authorized to use the card. Nevertheless, she charged $9,894.80 on the account. Troy sought offsets based on all of these exhibits in the total amount of $141,085.64, and the trial court granted relief in the amount of $141,085. When Claire testified, she professed no knowledge of most of the transfers. With regard to one of them, she claimed Troy had transferred $6,000 to pay credit card bills. That was the extent of her testimony. The trial court could properly exercise her discretion as the fact finder to believe Troy and disbelieve Claire. For all of these reasons, we overrule Issue One.

**ATTORNEYS' FEES**

---

[4] Because a gift by definition constitutes separate property, there can be no gift to the community estate. TEX.CONST. art. 16, § 15; TEX.FAM.CODE ANN. § 3.001 (Vernon 2006); *Long v. Long*, 234 S.W.3d 34, 39 (Tex.App.--El Paso 2007, pet. denied), *citing Jones v. Jones,* 804 S.W.2d 623, 627 (Tex.App.--Texarkana 1991, no writ); *Higgins v. Higgins,* 458 S.W.2d 498 (Tex.Civ.App.--Eastland 1970, no writ). Thus, when a gift is made, each spouse receives an undivided one-half interest as his or her separate property. The trial court's offset of $64,412.50, representing one-half of the total $128,825 transfer, reflects this reality.

In Issue Two, Claire challenges the fee award on six grounds: (1) there are no pleadings supporting a fee award to Charles Wilson; (2) the questions on attorneys' fees should not have been submitted and are immaterial because they are purely advisory; (3) the evidence is legally insufficient to prove that the attorneys' fees of Thomas Raggio and Charles Wilson were reasonable and necessary; (4) there was a double-recovery of attorneys' fees because the attorneys had already been paid from community funds; (5) Troy was not the prevailing party; and (6) Troy's counsel made an incurable jury argument on the fee issue.

*Pleadings*

A judgment must conform to the pleadings and proof, and a party may not be granted relief in the absence of pleadings to support it. *Stoner v. Thompson*, 578 S.W.2d 679, 682, 683-84 (Tex. 1979); *Marrs and Smith Partnership v. D.K. Boyd Oil and Gas Co., Inc.*, 223 S.W.3d 1, 18 (Tex.App.--El Paso 2005, pet. denied). When issues not raised by the pleadings are tried by consent, they must be treated in all respects as if they had been raised in the pleadings. TEX.R.CIV.P. 67; *Gutierrez v. Gutierrez*, 86 S.W.3d 721, 729 (Tex.App.--El Paso 2002, no pet.). This rule is limited to those exceptional cases where it clearly appears from the record as a whole that the parties tried an unpled issue by consent. *Gutierrez*, 86 S.W.3d at 729. It is not intended to establish a general rule of practice; it should be applied with care, and never in a doubtful situation. *Marrs and Smith Partnership*, 223 S.W.3d at 18. Trial by consent "applies only where it appears from the record that the issue was actually tried, although not pleaded." *Id., quoting Johnston v. McKinney American, Inc.*, 9 S.W.3d 271, 281 (Tex.App.--Houston [14th Dist.] 1999, pet. denied). To determine whether the issue was tried by consent, the court must examine the record not for evidence of the issue, but rather for evidence of *trial* of the issue. *Marrs and Smith Partnership*, 223 S.W.3d at 18.

Claire did not object to Wilson's testimony about his fees, nor did she object to submission

of the jury issue. Accordingly, the issue was tried by consent. TEX.R.CIV.P. 67.

*Charge Error*

Claire also maintains that the trial court should not have submitted Questions 12 and 13 because the jury's answers were merely advisory, and thus immaterial.[5] Troy counters that Claire waived her complaint because she failed to object to their submission. We agree. A party objecting to a charge must point out distinctly the objectionable matter and the ground of the objection. TEX.R.CIV.P. 274. *See also* TEX.R.APP.P. 33.1(a). Having failed to object at trial, Claire has waived her complaint of charge error.

*Legal Sufficiency*

The jury found that Claire should pay Troy's reasonable and necessary attorney's fees in the amount of $62,463 for Thomas Raggio and $50,074 for Charles Wilson. A court may apportion attorney's fees in a divorce action as part of a just and right division of property. *Sandone v. Miller-Sandone*, 116 S.W.3d 204, 208 (Tex.App.--El Paso 2003, no pet.). The reasonableness of the fee is a question of fact and must be supported by the evidence. *Id.* Expert testimony as to the reasonableness of the attorneys' fees is required to support an award of attorney's fees. *Cantu v. Moore*, 90 S.W.3d 821, 826 (Tex.App.--San Antonio 2002, pet. denied); *Lesikar v. Rappeport*, 33 S.W.3d 282, 308 (Tex.App.--Texarkana 2000, pet. denied).

A "no evidence" or legal insufficiency point is a question of law which challenges the legal sufficiency of the evidence to support a particular fact finding. *Serrano v. Union Planters Bank, N.A.*, 162 S.W.3d 576, 579 (Tex.App.--El Paso 2004, pet. denied). There are two separate "no

---

[5] A court may apportion attorney's fees in a divorce action as part of a just and right division of property. *Sandone v. Miller-Sandone*, 116 S.W.3d 204, 208 (Tex.App.--El Paso 2003, no pet.). Generally speaking, a jury finding as to the *amount* of reasonable and necessary fees is binding on the court, but a finding as to which party should *pay* those fees is advisory. Thus, while the trial court was not obligated to adopt the jury's finding, there was no prohibition against it.

evidence" claims. *Id*. When the party having the burden of proof suffers an unfavorable finding, the point of error challenging the legal sufficiency of the evidence should be that the fact or issue was established as "a matter of law." *Id*. When the party without the burden of proof suffers an unfavorable finding, the challenge on appeal is one of "no evidence to support the finding." *Id*.; *In re Estate of Livingston*, 999 S.W.2d 874, 879 (Tex.App.--El Paso 1999, no pet.). In this case, Troy had the burden to prove the reasonableness and necessity of his attorney's fees.

An appellate court will sustain a legal sufficiency or "no-evidence" challenge if the record shows: (1) the complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *El Paso Independent School District v. Pabon*, 214 S.W.3d 37, 41 (Tex.App.--El Paso 2006, no pet.). Claire argues that there is no evidence of the reasonableness and necessity of the attorney's fees. This contention falls under the first or third circumstances. In reviewing Claire's sufficiency challenge falling under the first category, we are precluded from automatically disregarding contrary evidence. *See City of Keller*, 168 S.W.3d at 810-11 (stating that contrary evidence may not be disregarded in sufficiency reviews under the first, second, and fourth categories).

In conducting our review, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *City of Keller,* 168 S.W.3d at 822. Even if evidence is undisputed, it is the province of the trier of fact to draw from it whatever inferences it wishes so long as more than one inference is possible. *Id*. at 821. But if the evidence allows only one inference, neither the trier of fact nor the reviewing court may disregard it. *Id*. We are also mindful that the trier of fact is the sole judge of the credibility of the witnesses and the

weight to give their testimony. *Id*. at 819. When there is conflicting evidence, it is the province of the trier of fact to resolve such conflicts. *Id*. at 820. In every circumstance in which a reasonable trier of fact could resolve conflicting evidence either way, the reviewing court must presume it did so in favor of the prevailing party, and disregard the conflicting evidence in its sufficiency review. *Id*. at 821. If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then the trier of fact must be allowed to do so. *Id*. at 822. So long as the evidence falls within this zone of reasonable disagreement, we may not substitute our judgment for that of the trier-of-fact. *Id*. The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *Id*. at 827.

The trial court admitted Petitioner's Exhibit 67, which summarizes the legal fees and expenses incurred by Troy Phillips in connection with the divorce case and a criminal case brought against him by Claire in connection with her assault accusation. The exhibit summarized the legal fees and expenses by date and by attorney. It reflected that the legal fees, excluding expenses, of the Law Offices of Raggio & Raggio totaled $71,848.75 for the time period between February 17, 2004 and April 19, 2005; the legal fees of McColl & McCullough totaled $15,000 for the time period between October 19, 2004 and February 28, 2005; and the legal fees of Charles Wilson between January 2005 and April 29, 2005 totaled of $25,365.00. No one from Raggio & Raggio testified. Respondent's Exhibit 108, offered into evidence by Claire's attorneys, included copies of the billing statements sent by Raggio & Raggio. This exhibit reflected the date on which legal services were rendered by Thomas Raggio but the description of the services rendered, the hourly rate, and the number of hours billed, had been redacted.[6] However, these statements do reveal the amount of fees

---

[6] Troy testified that when copies of the bills were provided to Claire's attorneys during discovery, he objected to inclusion of the description of services provided because the information was protected by the attorney-client privilege.

and costs incurred.

Wilson testified about his experience and expertise and stated that he charged an hourly rate of $285 which he believed to be less than what is charged by most board certified practitioners in Dallas. He opined that "[t]he charges on Exhibit 67are, I believe, reasonable and necessary charges for representing Mr. Phillips in this ongoing litigation."[7] In addition to the fees reflected in Petitioner's Exhibit 67, Wilson had another 125 hours in trial preparation resulting in additional fees of $35,824,[8] and Wilson anticipated billing another fifty hours for the last two days of trial and post-trial matters resulting in additional fees of $14,250. There is no evidence in the record of the hourly rate charged by Raggio & Raggio or the number of hours billed by that firm for representation of Troy in the divorce action. Nevertheless, Wilson testified that "all of these fees are reasonable and necessary in representing Mr. Phillips." He added that spending $175,000 in handling the divorce case was "ridiculous" but necessary under the circumstances.

The jury's determination that the attorneys' fees were reasonable and necessary is supported by legally sufficient evidence. We are guided in this analysis by decisions from the Dallas Court of Appeals. The Supreme Court of Texas entered a docket equalization order transferring this appeal to us from the Fifth Court of Appeals. *See* TEX.GOV'T CODE ANN . §73.001 (Vernon 2005). By virtue of recent amendments to the Texas Rules of Appellate Procedure, we are now required to apply the precedent of the transferring court on any relevant issue. *See* TEX.R.APP.P. 41.3.

In *In re M.A.N.M.*, 231 S.W.3d 562 (Tex.App.--Dallas 2007, no pet.), the appellant complained that the trial court had erred in finding that the appellee's attorney's fees were reasonable

---

[7] Exhibit 67 included Thomas Raggio's fees. Mr. Wilson did not limit his testimony to his own fees, nor was he cross-examined about Mr. Raggio's fees.

[8] 125 hours multiplied by the hourly rate of $285 equals $35,625.

and necessary, because the "proper legal basis for establishing such [was] wholly missing from the record." *Id.* at 567. In affirming the judgment, the court of appeals emphasized that the trial court has broad discretion in deciding the award of attorney's fees in family law cases. *Id.* While there should be evidence of the time spent by the attorney on the case, the nature of the preparation, the complexity of the case, the experience of the attorney, and the prevailing hourly rates, "evidence on each of these factors is not necessary to determine the amount of an attorney's fee award." *Id., citing Sandles v. Howerton*, 163 S.W.3d 829, 838 (Tex.App.--Dallas 2005, no pet.). Moreover, the court can consider the entire record and the common knowledge of the lawyers and judges. *In re M.A.N.M.,* 231 S.W.3d at 567, *citing Keith v. Keith*, 221 S.W.3d 156, 169 (Tex.App.--Houston [1st Dist.] 2006, no pet). Analogous to the case before us, the attorney there testified that the appellee had taken positions during discovery that had contributed to the amount of time spent on the case. *Id.* This passage is directly relevant to the issue we must address here:

> There was no testimony about Niebes's attorney's hourly rate or the number of hours he spent on the case. However, there is no rigid requirement that there must be evidence on both these facts to make a determination of attorney's fees. *Sandles,* 163 S.W.3d at 839, *Keith,* 221 S.W.3d at 170 (no requirement attorney must state exact dollar amount an number of hours necessary to appeal). Rather Niebes's counsel testified as to the total fees incurred and that the fees were reasonable and necessary.

*In re M.A.N.M.*, 231 S.W.3d at 567-68. We thus conclude that the evidence is legally sufficient to support the full fee award. Claire has not raised a factual sufficiency challenge.

*Double Recovery*

Claire next argues there is a double-recovery of attorneys fees because the attorneys fees had already been paid from community funds. The award of attorney's fees in a divorce action is treated as part of the fair and just division of the marital estate. *Grossnickle v. Grossnickle*, 935 S.W.2d 830, 846-47 (Tex.App.--Texarkana 1996, pet. denied). Prior payments out of the community estate

to attorneys in the divorce action are taken into account in the division of the marital estate. *Id.* at 847, *citing Eikenhorst v. Eikenhorst*, 746 S.W.2d 882, 890 (Tex.App.--Houston [1st Dist.] 1988, no writ). The record before us does not reflect that the trial court either did or did not take into consideration that a large portion of Troy's attorney's fees had been paid with community funds. Further, the divorce decree recited that the trial court made a just and right division of the parties' marital estate, having due regard for the rights of each party and incorporating the jury verdict. Claire's assertion that Troy received a double recovery is without merit. *See Eikenhorst*, 746 S.W.2d at 890 (where record did not reflect that trial court failed to take payment of attorney's fees by husband into account in making a just and right division of the marital estate, the trial court did not abuse its discretion by making the attorney's fee award to husband).

### Prevailing Party

Claire next maintains that the trial court erred in awarding attorney's fees to Troy because she was the prevailing party on her constructive fraud claim. As we have noted, the award of attorney's fees in a divorce action is part of the fair and just division of the marital estate. Consequently, the trial court is not restricted to awarding them to the prevailing party. *Grossnickle*, 935 S.W.2d at 846. This argument is without merit.

### Jury Argument

Finally, Claire argues that Troy's attorney made an incurable jury argument on the attorney's fees issue by stating that Troy had incurred a large amount of attorney's fees because Claire had insisted on her right to a jury trial. She cites to a portion of the record where Troy testified, without objection, that he did not want a jury trial and having a jury trial dramatically increased the costs of litigation. Claire also directs our attention to a portion of the record where attorney Wilson *testified*, without objection, that $175,000 in attorneys' fees was ridiculous but necessary because Claire had

requested a jury trial which took substantially longer than a bench trial. By failing to object to Troy's and Wilson's testimony, Claire waived any complaint on appeal. *See* TEX.R.APP.P. 33.1; TEX.R.EVID. 103(a)(1). Wilson stated in his closing argument that having a jury trial was a misuse of resources but it was Claire's right to insist on a jury trial. Claire did not object to this argument. Generally, to obtain reversal on the basis of improper jury argument, an appellant must prove (1) an error (2) that was not invited or provoked, (3) that was preserved by the proper trial predicate, such as an objection, a motion to instruct, or a motion for mistrial, and (4) was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the judge. *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex. 1979). Having failed to object, Claire failed to preserve error. Issue Two is overruled in its entirety.

## CHARACTERIZATION OF PROPERTY

In Issue Three, Claire contends that Troy did not prove by clear and convincing evidence that the $100,000 earnest money check tendered for the purchase of the Sperling[9] Building, the Dallas City Bank Certificate of Deposit, and the Old Grove real estate investment were his separate property.

### *Standard of Review*

All property on hand at the dissolution of marriage is presumed to be community property. *Long v. Long*, 234 S.W.3d 34, 37 (Tex.App.--El Paso 2007, pet. denied); TEX.FAM.CODE ANN. § 3.003(a) (Vernon 2006). It is a rebuttable presumption, requiring a spouse claiming assets as separate property to establish their separate character by clear and convincing evidence. *Long*, 234 S.W.3d at 37; TEX.FAM.CODE ANN. § 3.003(b). Property owned before marriage, or acquired during marriage by gift, devise, or descent, is separate property. *Long*, 234 S.W.3d at 37; TEX.FAM.CODE

---

[9] At various points throughout the record, this property is referred to as "Spurling" and "Sperlock."

ANN. § 3.002.  Where an asset is purchased during marriage with monies traceable to a spouse's separate estate, the asset may appropriately be characterized as separate property. *Long*, 234 S.W.3d at 37.

We set forth the standard for traditional legal sufficiency review in the context of Issue Two. But traditional sufficiency review is heightened when the burden of proof is by clear and convincing evidence. *In re J.F.C.*, 96 S.W.3d 256, 266-67 (Tex. 2002); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).  In a legal sufficiency review, we look at all the evidence in the light most favorable to the fact finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that the finding was true. *In re J.F.C.*, 96 S.W.3d at 266.  In so doing, we must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so. *Id*.  We should disregard all evidence that a reasonable fact finder could have disbelieved or found to be incredible, but this does not mean that we must disregard all evidence that does not support the finding. *Id*.  If we determine that no reasonable fact finder could form a firm belief or conviction that the fact is true, then we must conclude that the evidence is legally insufficient. *Id*.

*The Sperling Building*

Claire concedes that the jury was not asked to determine whether the earnest money for the Sperling Building was Troy's separate property.  Instead, the jury was asked to determine whether failure to complete the purchase of the Sperling Building resulted in a fraud on the community.  The jury found no fraud had been committed and Claire has not challenged that finding on appeal.  She does contend, however, that the court erred in failing to characterize the property as community.  But no characterization was submitted to the jury; in fact, the charge conference includes the following discussion as to how the issue should be submitted:

[Court]                  All right.  Number 18, Sperling Properties?  Where did that --

[Claire]            That was the building that we invested $100,000 in in our own names to buy Claire and Troy, and it left GPM into a contract in our names.

[Ms. McKnight]      But it doesn't exist now.

[Mr. Wilson    ]    If it doesn't exist, Judge, there's no submission. Again, if they want to argue it on some fraud theory about money that we should have received, it's one thing. It's a claim. It's not an asset.

[Ms. McKnight]      The Sperlock Building didn't close.

[Wilson]            Yes. So it didn't happen.

[The Court]         Okay. Then you'll need to give me a fraud issue on the investment if you want to submit that, but not on a nonexistent asset.

[Ms. McKnight]      That would be part of our fraud claim.

[The Court]         Well, that may be, but I haven't gotten to those yet.

                              * * * * * * * *

[The Court]         Let's move to what will be Question 11 which is the old Question 8 that we're going to reform in the nature of a gift question for the -- what is it -- Sperlock Investment or Sperling?

[Mr. Wilson]        Sperling.

[Ms. McKnight]      Sperling Building.

[The Court]         Anybody got a suggestion? Do you find from a preponderance of the evidence --

[Mr. Wilson]        Do you find from a preponderance of the evidence that there was a gift from GPM of $100,000 to the community related to, I guess, the Sperling transaction, and was it -- and it needs to be -- I think the proper format in the PJC is it has to be a completed gift transaction.

[The Court]         Just a minute.

| | |
|---|---|
| [Mr. Wilson] | I think it has to have the word 'completed' in there, and I don't know how to gerrymander that in there. But I think that's part of the correct definition. |
| [Ms. McKnight] | I have a real problem with the word 'gift' became any earnings that he takes out of GPM becomes community immediately, and those were obviously monies that he had earned that were available for spending. He chose to invest it in the Sperling Building. |
| | So a 'gift'? I don't think so. |
| | How would it be a gift? If it's money he's earned in the corporation he's going to take it out to make an investment, and both their names were on that contract. |
| [The Court] | Well, then do you want to submit it as a fraud issue? Do you find that the community was defrauded -- |
| [Ms. McKnight] | Yes. Yes. |
| [The Court] | -- by the failed investment? |
| [Ms. McKnight] | -- by the return of the investment money into -- |
| [The Court] | -- That's not right. |
| [Mr. Wilson] | You see -- boy, that -- because then you get into a problem with the general fraud thing that Neal has created because there's a huge overlap. |
| [Mr. Young] | I have not created it. |
| [Mr. Wilson] | No. But, I mean, you -- he worded it -- |
| [Ms. McKnight] | He exposed it. |
| [Mr. Young] | I think we should leave it as he stated. I'm more comfortable with that than I am trying to put it in another section. |
| [The Court] | So what do you want to do? |
| [Mr. Young] | What he stated. |
| [The Court] | Okay. |

[Mr. Young]        I think it would be less confusing that way.

[Mr. Wilson]       And I don't know how to -- I don't know -- I don't know how to put the completion part in there because it needs to be a completed transaction.

[Mr. Young]        Put the word 'completed' in the --

[Mr. Wilson]       Yeah, was it a completed gift or something like that.

[Ms. McKnight]     But why would it be a gift?

[Ms. Jordaan]      Came out of GPM and -- in the name of Claire -- they were trying to buy the building in the name of Mr. and Mrs. Phillips for which [Troy] testified that GPM would then lease. Then when the transaction fell through Troy testified he put the money back into GPM.

[The Court]        I know. How about we say, Do you understand from a preponderance of the evidence that the community was damaged as a result of the incomplete purchase of the Sperling Building.

[Ms. McKnight]     That would be fine.

[Mr. Wilson]       No.

[Ms. Jordaan]      I'll take that. That's great.

[The Court]        Okay. Give me another one.

                          * * * * * * * *

[Mr. Wilson]       The problem is there's no pleading of any damage allegation, Judge. It has to fall under, really --

[The Court]        -- fraud or reimbursement.

[Mr. Wilson]       Yeah, fraud or reimbursement. And this is not a proper damage allegation. Asking was the community damaged violates the pleadings that have been set forth and the causes of action that have been presented. So it has to be under one of the other two categories.

                   If she wants to say it's a gift, which I think is the most logical

way to say it, then do that. If they don't want to do that, then we can go back to putting it as a fraud or a reimbursement.

It's not a reimbursement so it will have to be a fraud. But they don't have any pleadings of any damage.

\* \* \* \* \* \* \*\*

[The Court]      How about we say, Do you find from a preponderance of the evidence that there was a -- that the failure to complete the purchase of the Sperling Building resulted in a fraud on the community.

[Mr. Wilson]      Yes. That's a -- yeah. That would be supported by the pleadings and what they've contended.

\* \* \* \* \* \* \*

[The Court]      Let me read this for the reported [sic].

This is New Question Number 11. Do you find from a preponderance of the evidence that the failure to complete the purchase of the Sperling Building resulted in fraud on the community? Answer yes or no. If your answer is yes, answer in dollars and cents, if any. And I don't think it's a comment on the weight of the evidence because everyone agrees that they didn't complete the purchase.

Do you have any objection to that issue, Ms. McKnight?

[Ms. McKnight]      No, I don't.

[The Court]      Mr. Young?

[Mr. Young]      I do not.

Claire elected the method by which to present her issue, and she opted to charge the jury on fraud. She was unsuccessful. Because there was no asset to be characterized, this portion of Claire's complaint is overruled.

### The Certificate of Deposit

The record reflects that Troy maintained a bank account prior to marriage at Gateway

National Bank which he referred to as his "special account." All of the funds in the Gateway National Bank "special account" were Troy's separate property. On August 28, 2003, Troy wrote check number 1415 on the account in the amount of $50,000 and deposited it into his Ameritrade account. The funds in the Ameritrade account were also his separate property. Approximately one year later, on August 5, 2004, Troy withdrew $99,000 from the Ameritrade account and opened an account at Dallas City Bank. On August 25, 2004, he withdrew $50,000 from the Dallas City Bank account and bought a certificate of deposit at Dallas City Bank. Troy introduced the banking documents into evidence and testified concerning the nature of the transactions. This evidence is legally sufficient to permit a fact finder to form a firm belief or conviction that the $50,000 Dallas City Bank CD is Troy's separate property.

### Oak Grove, L.P.

During the marriage, Troy approached Claire about making a community investment in Oak Grove, L.P., a residential real estate venture. When Claire voiced her objection, Troy told her that he would invest his separate property. Because the documents for the investment had already been drafted with Claire's name included on them, Troy crossed out her name and executed the limited partnership agreement with the notation "as his sole and separate property." He made the $50,000 investment with a check drawn on his firm's operating account because he had originally thought it would be a community investment, but he repaid it a little over a month later with cash withdrawn from his Gateway National Bank "special account." This evidence is legally sufficient to permit a fact finder to form a firm belief or conviction that the Oak Grove L.P. real estate venture was Troy's separate property. Claire has not challenged the factual sufficiency of the jury's findings. We overrule Issue Three.

### PRE-JUDGMENT INTEREST

In Issue Four, Claire argues that the trial court erred by failing to award pre-judgment interest on the constructive fraud judgment. Prejudgment interest is "compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998), *quoting Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 552 (Tex. 1985). While one spouse's fraud on the community estate could justify an unequal division of the estate, "there is no independent tort cause of action for wrongful disposition by a spouse of community assets." *Schlueter v. Schlueter*, 975 S.W.2d 584, 589 (Tex. 1998). A money judgment to one spouse based on constructive fraud is a means of effecting an equitable division of the community estate; it is not an award of separate damages for an independent tort cause of action. *Schlueter*, 975 S.W.2d at 589.

Nevertheless, Claire directs us to *Perry Roofing Co. v. Olcott*, 744 S.W.2d 929 (Tex. 1988), in which the Texas Supreme Court held that pre-judgment interest is appropriate in a fraud claim. Of course, *Perry* pre-dates *Schlueter* and the fraud judgment there did not arise as a result of an economic tort committed against the community estate. She next cites *Toles v. Toles*, 45 S.W.3d 252 (Tex.App.--Dallas 2001, pet. denied), wherein the appellate court reinstated a $325,000 tort award in a divorce case for calculation and assessment of pre-judgment and post-judgment interest. But the tort judgment in *Toles* related to personal injuries sustained by the wife as a result of the husband's assault. The difference is significant: damage awards for personal injuries are separate property; awards for economic torts committed against the community estate belong to the community. *Schlueter*, 975 S.W.2d at 587, *citing Twyman v. Twyman*, 855 S.W.2d 619, 625 n.20 (Tex. 1993). Had the jury believed Claire was assaulted and awarded her damages for that assault, pre-judgment interest could be applied to her damage award. Whether we agree with it or not,

*Schlueter* sets the parameters of economic torts committed against the community estate. Consequently, Claire is not entitled to pre-judgment interest. We overrule Issue Four.

## DIVISION OF THE COMMUNITY ESTATE

In her final issue, Claire challenges the trial court's division of the community estate. Because of the multitude of sub-issues incorporated in her argument, we will set it out in full:

> The trial court made an inequitable division of the community estate in the Final Decree of Divorce, not only by the amount of actual award made to Mr. Phillips but also by the failure of the court to address the division of a substantial amount of community property and liabilities in the Final Decree of Divorce. The trial court erred in awarding stipulated community property to Mr. Phillips as his separate property. Did the trial court abuse its discretion in dividing the community estate 95% to Mr. Phillips and 5% to Claire?

*Standard of Review*

The trial court has wide discretion in dividing the marital estate of the parties. TEX.FAM.CODE ANN. §7.001 (Vernon 2006); *Jacobs v. Jacobs*, 687 S.W.2d 731, 733 (Tex. 1985); *Kimsey v. Kimsey*, 965 S.W.2d 690, 704 (Tex.App.--El Paso 1998, pet. denied). We presume that the trial court exercised its discretion properly, and the division will not be corrected on appeal unless a clear abuse of discretion is shown. *Murff v. Murff*, 615 S.W.2d 696, 698 (Tex. 1981); *Kimsey*, 965 S.W.2d at 704. The trial court's ultimate division need not be equal as long as it is equitable and the circumstances justify a disproportionate division. *Kimsey*, 965 S.W.2d at 704. In exercising its discretion, the trial court may consider many factors, including a disparity of income or earning capacity, the spouses' capacities and abilities, benefits which the party not at fault would have derived from continuation of the marriage, business opportunities, education, relative physical conditions, relative financial condition and obligations, disparity of ages, size of separate estates, and the nature of the property. *Murff*, 615 S.W.2d at 699.

*Attack on Findings of Fact*

Claire contends that certain findings of fact are not supported by the evidence:

● Finding of Fact 7.  That at all times during the marriage [Claire] chose to remain unemployed, despite being well educated, extremely intelligent and having a previous work history.

Claire counters by focusing on her trial testimony that Troy did not want her to work.  She was also unable to work for a lengthy period of time while she attended to her son's critical injuries following a tragic car bombing.

● Finding of Fact 5.  That at all times during the marriage [Troy] was fully employed and contributed gross earnings of approximately $300,000 per year to the community.

Claire responds that Troy made at least $400,000 per year while she grossed $85,000 per year at her peak earning capacity.

● Finding of Fact 10.  During the marriage [Troy] and [Claire] acquired the following community property, other than by gift or inheritance, which the Court has awarded to [Troy] as part of the division relating to the jury verdicts and awards of the Court that offset each other:

The American Ironhorse Convertible Note in the approximate amount of $15,000, and the payments received thereon, in the approximate amount of $1,500.

Claire does not challenge the finding; she merely argues that awarding the note to Troy was clearly inequitable.

● Finding of Fact 11.  During the marriage [Troy] and [Claire] acquired the following community property, other than by gift or inheritance, which the Court has awarded to [Claire] as part of the division relating to the jury verdicts and awards of the Court that offset each other:

The community interest in the Troy Phillips 401k account at Glast, Phillips & Murray, P.C., in the amount of $36,867.

Claire argues that this finding is patently erroneous because Troy and his attorney stipulated the value at $46,000 during the course of the trial.  This is true.  But when they learned the amount was inaccurate, they brought the issue to the trial court's attention and the trial judge agreed.  Claire

directs us to no authority that an error in a bank account discovered during trial cannot be corrected, and we decline to so hold.

● Finding of Fact 19. Concerning the credit card debts that [Troy] is ordered to pay, the Court finds:

(d) The total amount of these accounts is $58,931.48. The Court further finds that when reduced by the improper charges by [Claire] in the sum of $9,894.80, this leaves the amount of $49,037.

Claire complains that her credit card debt of approximately $45,000 was not considered by the trial court. However, the record reference she cites in support of her claim relates to a bound volume prepared by her attorney in connection with the hearing on her motion for new trial. This exhibit was never introduced into evidence.

● Finding of Fact 21. That [Troy] and [Claire] each contributed $125,000 in separate property contributions to the purchase of 12516 Degas, Dallas, Texas.

Claire argues that Troy contributed only $92,000. Troy's exhibits and tracings demonstrated that his contribution totaled $125,000.

● Finding of Fact 24. That during the marriage of the parties, but after their separation and filing of divorce, [Troy] purchased the residence located at 5108 Westgrove, Dallas, Texas. This property had a significant negative value at the time of trial and [Troy] agreed to treat it as his separate property and debt, which was accepted by the Court and opposing counsel.

● Finding of Fact 12. The undisputed evidence of stipulations of the parties establish: (1) that [Troy] owned the following separate property items, before marriage or as a permutation of a previously owned separate item, and (2) each party waived any community claim to increases, interest or dividends earned by such accounts or items:

(11) All right, title and interest in the 2000 Mercedes 500S automobile.

Claire contends that these findings and are totally against the stipulated evidence that both assets were community property. Certainly they were. But the record clearly indicates that Troy owed

more on the Westgrove home than what it was worth, an assertion Claire does not dispute.[10] As for

the Mercedes, the evidence indicates that the car had a value of $45,000 against a lien of $45,000.

Regardless of whether Claire disagrees that everyone stipulated a willingness to treat these assets as

Troy's separate property so as not to reduce the community estate, she has not established, nor

attempted to establish, any harm in the mischaracterization. Characterizing these assets as

community property will diminish the value of the community estate. *See Tate v. Tate*, 55 S.W.3d

1, 7 (Tex.App.--El Paso 2000, no pet.), *citing Vandiver v. Vandiver,* 4 S.W.3d 300, 302 (Tex.App.--

Corpus Christi 1999, pet. denied)(mischaracterization of community property as separate property

is not reversible unless the mischaracterization had more than a *de minimus* effect on the just and

right division)

> ● Finding of Fact 13. During the trial the Court allowed each party the opportunity to contest the characterization of any disputed property items. . . .

Claire considers this an erroneous finding because there were many issues remaining after the jury

trial. She complains that the decree fails to divide $1,000,000 in undivided income received by Troy

during the separation, the Van Meter note receivable of $142,000,[11] the $50,000 in purchases for the

Westgrove residence and the $100,000 down payment on the Sperling Building.

As is generally the case in divorce litigation, the parties here disagreed over characterization,

valuation, economic torts, reimbursement, and equitable division. It is fair to say that the sixteen

---

[10] During the bench trial, Mr. Wilson advised the court : "And, Your Honor, there is Exhibit 41 which we put in evidence at the previous trial which is a listing of our separate property. We included that car and its debt, the Westgrove house and its debt on that. In the previous trial we went through that. Those were really community items but we were taking them because they were under water, and there was no dispute. They had been through the documents on that stuff."

[11] Ruth Van Meter Wagner was an attorney with whom Troy practiced law and engaged in an affair before his marriage to Claire. Claire's financial expert, Dennis Lee Chamberlain, testified that Troy had loaned the lady $150,000, of which $142,000 was still owed. Troy specifically denied this, , but he did admit lending her $5,000 in 1999 when she was buying a house. He did not marry Claire until 2001.

volumes of testimony contain a great deal of finger-pointing, blame-laying, and he-said/she-said exchanges. We understand that Claire is dissatisfied with the outcome -- the jury did not believe that she had been assaulted. To add insult to injury, the jury thought she should pay all of Troy's attorneys' fees. She was at odds with her attorneys, suing them for malpractice when they intervened to recover their fees. She has endured the numerous hospitalizations, surgeries, and rehabilitation of her son. We are also mindful of Troy's frustrations. The parties were married on February 1, 2001 and separated in November 2003. He filed for divorce on December 29, 2003, and the final decree was signed on January 13, 2006. Cohabitation lasted 34 months; the litigation lasted almost as long. During the jury trial, the credibility of the witnesses was an issue for the panel to decide; in the bench trial, credibility was determined by the trial judge. We conclude that the findings of fact are duly supported by the evidence.

## *Division of the Community Estate*

We come now to the gravamen of Claire's final issue. She contends that the community estate was divided disproportionately, with Troy receiving 95% while she received only 5% of the assets. Again, we must note that her calculations of the division are based upon exhibits she prepared but never introduced into evidence. The exhibits characterize and value the assets according to her trial theories and they are at odds with the trial court's findings. While she sought additional findings of fact, the trial court apparently did not consider them, and Claire has not challenged as error the trial court's failure to make additional findings. Consequently, our review of the division must be predicated upon the size of the community estate as found by the court. Rather than the $1.63 million that Claire claims as total community assets, the court found the gross community estate to be worth roughly $478,000, excluding furniture, furnishings, and personal possessions of each spouse, which were not valued by the trial court:

### Assets

| | |
|---|---|
| Economic fraud recovery | $404,407.00 |
| Community interest in Troy's 401k account | $ 36,867.00 |
| American Ironhorse note | $ 15,000.00 |
| Ironhorse payment | $ 1,500.00 |
| Interest owed Claire by Troy's separate estate | $ 6,900.00 |
| Fees due for the value of decorating services | |
| Claire performed for GPM | $ 13,500.00 |
| | $478,174.00 |

### Liabilities

| | |
|---|---|
| Troy's attorney's fees | $112,357.00 |
| Credit card debt | $ 49,037.00 |
| Offsets in Troy's favor | $141,085.00 |
| | $302,479.00 |

The net community estate is thus $175,695.00. In dividing the estate, the trial court began with the $404,407 judgment in Claire's favor and added to it the $6,900 in interest and the $13,500 in decorating fees. From that, she subtracted Troy's attorney's fees, his credit card debt, and the offsets in Troy's favor, leaving $122,328. Claire was awarded the interest in the 401k in the amount of $36,867, while Troy was awarded the Ironhorse note and payment totaling $16,500. These three numbers -- $122,328 + $36,867 + 16,500 -- total $175,695. But we come now to a mathematical error. The trial court took the remainder of the judgment -- $122,328 -- and *subtracted* the amount of the 401k to reach $85,461. She then *added* the amount of the Ironhorse note and payment -- $16,500 -- to reach the amount of the judgment awarded to Claire in the final decree -- $101,961. In fact, the opposite should have occurred to effect the division she intended. The assets as divided do not total the net community estate. According to the decree, Claire received a money judgment of $101,961 and the monies in the 401k of $36,867, for a total of $138,828. Troy received the Ironhorse interests of $16,500. Adding these numbers results in a sum of $155,328, which is $20,367 less than the net community estate. And $20,367 is exactly the difference between the

$122,328 money judgment remainder and the $101,961 judgment awarded to Claire. It is also the precise difference between the value of the 401k and the Ironhorse note.

We turn now to the percentage distribution. Of the $175,695 net community estate, Claire was awarded $138,828, or 79%. Troy was awarded $16,500, or 10%. The $20,367 error represents 11%, which was effectively awarded to Troy. If we adjust the distribution accordingly, Claire has received $138,828, or 79% while Troy has received $36,867, or 21%. Is a 79%-21% distribution in Claire's favor unfair or inequitable? Had the issue not been squarely presented to the trial court for re-consideration, we might be inclined to suggest a remittitur.[12] But the error was clearly spelled out in Claire's forty-nine page motion for new trial and argued at the hearing thereon. We therefore presume that the trial court intended the division manifested in the decree, awarding Claire 79% of the community estate. We overrule Issue Five and affirm the judgment of the trial court below.

March 26, 2009

ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Carr, JJ.
Carr, J., not participating

---

[12] There is ample support in Texas jurisprudence for an error in dividing property incident to divorce (which would ordinarily require an appellate court to reverse and remand for a new property division) to be cured by remittitur. *See Burney v. Burney*, 225 S.W.3d 208, 220 n.3 (Tex.App.--El Paso 2006, no pet.).