COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



SUHEY L. ATTAGUILE,

|  |  |  |
|---|---|---|
| Appellant, | § | No. 08-16-00222-CV |
| v. | § | Appeal from the |
| ANGELO F. ATTAGUILE, | § | 65th District Court |
| Appellee. | § | of El Paso County, Texas |
|  | § | (TC# 2014DCM2379) |
|  | § |  |

## **O P I N I O N**

Appellant Suhey Attaguile ("Suhey") challenges the trial court's division of marital property, arguing that the trial court improperly characterized a community property asset as being the separate property of Appellee Angelo Attaguile ("Angelo"). Suhey also contends that the trial court abused its discretion in calculating the amount of child support Angelo owed, arguing that the trial court erred by failing to take into consideration certain net resources that the trial court awarded to Angelo in making its child support calculation. We reverse with respect to the issue of property division and affirm as to the child support award.

### **FACTUAL AND PROCEDURAL BACKGROUND**

The parties were married on November 25, 2004. They had two children together, but only one of them, a then ten-year-old daughter, was young enough to be the subject of the trial court's

order on child support. Angelo filed a petition for divorce on April 3, 2014, and Suhey filed an answer, as well as a counter-petition, seeking custody of their daughter, as well as child support. The parties waived a jury trial, and a final hearing was held before the trial court on May 2, 2016.

Prior to the hearing, the parties agreed that they would both serve as joint managing conservators of their daughter, that Suhey would serve as the primary custodial parent with the exclusive right to designate residence, and that Angelo would have standard visitation rights. In addition, the parties agreed that Angelo would pay child support and provide health insurance for their daughter; however, the question of how much he was obligated to pay was a subject of dispute at the hearing. As well, at the hearing, the parties argued over the characterization of certain property, and how the marital assets should be divided.

### The Property Division

At the hearing, the parties presented evidence with respect to five different homes located in El Paso, Texas, two of which were purchased by Angelo prior to the marriage and three of which were purchased during the marriage. In particular, Angelo testified that he purchased a home located on Georgia Place and a second home located on Altura Avenue prior to the marriage, which he asserted were his separate property. He acknowledged, however, that the community had an $8,000 interest in the Altura Avenue property due to payments made on the property during the marriage. The trial court "confirmed" both of these properties as Angelo's separate property, but gave Suhey a $4,000 cash payment in recognition of her community property interest in the Altura house.

Angelo further testified that the parties purchased three other properties during the marriage, one on Findley Avenue, a second on Piedras Street, and a third on Memphis Avenue. With respect to the Findley and Piedras properties, Angelo acknowledged that those two properties

2

belonged to the community and that he believed Suhey was entitled to share in the equity that existed in those two homes. In its Final Decree of Divorce, the trial court categorized these homes as community property subject to a just and right division, awarding Angelo 100 percent ownership of the Findley and Piedras properties, while giving Suhey cash in the amount of $21,500 for her community interest in the Piedras property, and $3,500 for her "community interest" in the Findley property.

The issue regarding the characterization of the Memphis Avenue Property is more complicated and lies at the heart of this appeal. At the hearing, Angelo testified that he and Suhey purchased the Memphis Avenue property in 2006 from his mother prior to her death. The undisputed evidence established that Suhey and Angelo received a warranty deed from Angelo's mother, dated November 28, 2006, giving them title to the Memphis Avenue property as husband and wife. The warranty deed stated that Angelo's mother was granting title to the property to them in exchange for an unstated amount of "cash" and a note of $60,000 secured by a vendor's lien (the "Original Note"). Although Angelo's testimony was somewhat confusing on this point, he indicated that a cash down payment of $20,000 was made toward the purchase of the Memphis Avenue property, but he did not identify the source of that down payment.

The parties agreed that in 2010, the Original Note, which then had an outstanding balance of $43,933, was paid off. However, the parties did not agree on what funds were used to pay off the Note. Angelo testified that he paid off the Original Note to his mother in 2010, with the proceeds from the sale of an insurance agency that he owned prior to the marriage, which, as discussed in more detail below, he considered to be his separate property. Angelo presented evidence of a deposit that he made on August 27, 2010 of $105,000 following the sale of the insurance agency, as well as documentation of a withdrawal that he made shortly thereafter on

3

September 10, 2010 in the amount of $43,923, which he testified he used to pay off the Original Note on the Memphis Avenue property. On the other hand, Suhey testified at the hearing that she believed the Original Note had been paid off with the proceeds from certain unspecified "investments" that the couple had made during the course of their marriage. However, Suhey did not provide any documentation of these investments, claiming that Angelo hid their finances from her and that she had no access to their financial records.

Thereafter, in July of 2012, while the parties were still married, they sold the Memphis Avenue property to Rene Diaz for $65,000 on an owner-financed contract. The warranty deed to Rene Diaz listed the grantors as Angelo and Suhey, as husband and wife, and stated that the property was being sold to Diaz in consideration of ten dollars, together with a real estate lien note signed by Diaz and made payable to both Angelo and Suhey, in the amount of $65,000 (hereinafter the "Diaz Note"). Both Angelo and Suhey signed the warranty deed. Suhey testified that the balance owed on the Diaz Note at the time of trial was $50,000. Angelo did not present any countervailing evidence as to the value of the Diaz Note.

At the hearing, both attorneys made statements acknowledging that the Memphis Avenue Property was community property due to the "inception of title" doctrine because it was purchased during the marriage.[1] The trial court, however, expressly confirmed the Diaz Note as being Angelo's separate property, giving no reimbursement to the community estate for any interest that

---

[1] At trial, Suhey's attorney made statements to the court in which he characterized the Memphis Avenue property as a "community property asset[]." In response, Angelo's attorney stated that he agreed with that characterization based on the "inception of title" doctrine, and later stated that he understood the property to be community property due to the fact that it was purchased during the marriage. During closing arguments, Suhey's attorney once again argued that the Memphis Avenue property should be considered community property. Angelo's attorney did not dispute that statement, but instead argued that Angelo paid off the Original Note on the property with his separate property, i.e., the proceeds from the sale of his insurance agency.

4

it may have had in the Note.

In its Decree, the trial court treated all of the parties' other assets as being part of the marital estate subject to a "just and right division," determining, among other things, that each party would keep any cash and/or money on account in their sole control, as well as all retirement accounts existing by reason of the party's past, present or future employment, and that they would split the anticipated income tax return from Suhey's earnings for the prior year, in the amount of $5,800. In addition, the trial court ordered both parties to pay any debts they incurred "solely" in their names, and ruled that Angelo was to be responsible for all encumbrances, including mortgages owed, on the properties that he was awarded.

### The Child Support Award

At the hearing, Angelo testified that he began working as an employee of an insurance agency in 1988. Ten years later, in 1998, the insurance company for which he worked converted its employees to independent contractors, which allowed him to purchase the agency at that time. Angelo testified that the insurance agency was worth approximately $300,000 to $350,000 at the time he and Suhey were first married in 2004. However, he testified that the agency's value thereafter went down, and he sold the agency in 2010 to two separate buyers, for a total of approximately $260,000, with payments spread out over the course of at least five years, with the last payment made in 2015. Angelo testified that based primarily on the proceeds he received from the sale, his 2014 gross income was $47,000 and his 2015 gross income was $54,000. Angelo testified that he used the initial proceeds from the sale to pay off "all of the community debts," and to take the family on various vacations. According to Angelo, as of the date of trial, all of the proceeds from the sale had been spent, with the exception of approximately $41,000, which was in a bank account in his name only.

Although Angelo acknowledged that he was only 54 at the time of trial and was not disabled, he testified that after selling his insurance agency, he considered himself to be retired. However, he testified that he occasionally worked as an independent contractor for insurance agencies, typically working only three weeks out of the year. Angelo testified that the year before trial, he worked approximately seven weeks as an independent contractor, and received an additional $4,000 that year over what his income typically is for performing such work. Angelo further testified that he was not yet eligible to receive social security, and that he had not yet begun taking any money out of a retirement account that was in his name, which was worth approximately $132,000, indicating that he did not wish to start making withdrawals until he reached "the age of retirement."

Angelo testified that after selling the insurance company, his primary source of income came from the rental payments on the various homes that he and/or both parties owned, as well as the monthly payment on the Diaz Note from the sale of the Memphis Avenue property. Angelo testified at trial that the rental incomes from these properties, together with the payment on the Diaz Note, was $2,747. However, Angelo explained that this was the gross amount he received each month, and that the amount did not include mortgage payments that he was required to make on one of the rental properties in the amount of $768.40 a month, and also did not include deductions or repairs to any of the properties. Although Angelo did not specify what additional deductions he expected to take with regard to his properties, he estimated that his adjusted gross income in the future from these sources would be approximately $13,000 annually, and he asked the trial court to use that amount to calculate his child support obligation.

Suhey did not present any evidence to contradict Angelo's anticipated income, but she asked the court to also consider a retirement fund that was in Angelo's name in determining his

income, even though Angelo had not yet started to withdraw any money from that fund. Suhey also requested that the trial court consider Angelo's testimony regarding the income he received in 2014 and 2015 from the sale of his insurance agency in calculating child support.

In the Final Decree, the trial court named both parties as joint managing conservators of their daughter, with Suhey named as the parent joint managing conservator with the exclusive right to designate the primary residence of the child. In addition, the court ordered Angelo to pay child support in the amount of $263.72 a month, and to pay for the child's health insurance in a "reasonable" amount.

### The Request for Findings of Fact

After the trial court issued its Decree on August 17, 2016, Suhey filed a request for Findings of Fact and Conclusions of Law the next day, and attached her proposed findings. In her proposed findings, Suhey chronicled the history of the Memphis Avenue property, noting that title to the property had been held in the name of both parties, and that after its sale, the Diaz Note was made payable to both parties. The proposed findings also stated that Angelo was able to work, but chose not to, and that he had approximately $100,000 available to him in retirement funds, which he refused to utilize in support of the child. The trial court acknowledged receipt of the request on August 19, 2016, but crossed out all of the proposed findings. On August 23, 2016, Suhey filed a notice with the district clerk, indicating that she had made a request for findings of fact, but did not indicate that the findings were past due. The trial court did not issue any findings of fact or conclusions of law, and this appeal followed.

### DISCUSSION

Suhey raises two issues on appeal. First, she argues that the trial court erred by confirming the Diaz Note as Angelo's separate property. And second, she argues that the trial court erred by

7

not considering the funds available to Angelo in the retirement and bank accounts awarded to him as part of the division of the community estate, in the court's calculation of the amount ordered for monthly child support.

## ISSUE ONE: THE PROPERTY DIVISION

### Standard of Review

We review most appealable issues in a family law case, such as property division incident to divorce or partition, conservatorship, visitation, and child support, under an abuse of discretion standard. *Richardson v. Richardson*, 424 S.W.3d 691, 695–96 (Tex. App.—El Paso 2014, no pet.) (citing *Garcia v. Garcia,* 170 S.W.3d 644, 648 (Tex. App.—El Paso 2005, no pet.)). The test for an abuse of discretion is whether the trial court acted without reference to any guiding rules and principles, or in other words, whether the trial court's actions were arbitrary and unreasonable. *Id.* (citing *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex. 1985)); *see also City of San Benito v. Rio Grande Valley Gas Co.*, 109 S.W.3d 750, 757 (Tex. 2003). In reviewing a trial court's division of a marital estate, it is our duty to presume that the trial court properly exercised its discretion. *Richardson*, 424 S.W.3d at 696 (citing *Chafino v. Chafino,* 228 S.W.3d 467, 473 (Tex. App.—El Paso 2007, no pet.); *Burney v. Burney,* 225 S.W.3d 208, 215 (Tex. App.—El Paso 2006, no pet.)); *see also Murff v. Murff,* 615 S.W.2d 696, 698–99 (Tex. 1981) (recognizing that trial courts have broad discretion in dividing the marital estate, and we presume that the trial court exercised its discretion properly).

When, as here, we lack findings of fact and conclusions of law, we must presume that the trial court made all the findings necessary to support the judgment, or in other words, we must

8

consider that the trial court made implied findings that would support the judgment. [2] *Ad Villarai, LLC v. Chan Il Pak,* 519 S.W.3d 132, 135 (Tex. 2017) (citing *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002)); *Worford v. Stamper,* 801 S.W.2d 108, 109 (Tex. 1990) (in a non-jury trial where the court of appeals is without the benefit of the trial court's formal findings of fact and conclusions of law, appellate court will presume that the trial court made all findings necessary to support the judgment); *see also Sprick v. Sprick,* 25 S.W.3d 7, 11 (Tex. App.—El Paso 1999, pet. denied). If some evidence exists to support the trial court's implied findings, "we must uphold the judgment on any theory of law applicable to the case." *See Garcia v. Garcia,* 170 S.W.3d 644, 648 (Tex. App.—El Paso 2005, no pet.); *In the Interest of W.E.R.*, 669 S.W.2d 716, 717 (Tex. 1984) (where findings of fact and conclusions of law are not properly requested and none are filed, appellate court must affirm the trial court's judgment on any legal theory that finds support in the evidence). When determining whether there is evidence in the record to support the judgment and implied findings of fact, we consider only the evidence most favorable to the trial court's judgment and disregard entirely evidence that is opposed to it or contrary in nature. *Winger v. Winger*, No. 09-01-188CV, 2002 WL 1477813, at *1 (Tex. App.—Beaumont July 11, 2002, no pet.) (not designated for publication) (citing *Worford*, 801 S.W.2d at

---

[2] We note that Suhey repeatedly refers in her briefing to the fact that the trial court refused to make findings of fact and conclusions of law. Suhey, however, did not properly preserve this issue for our review, as she failed to file a notice of past due findings as required by Rule 297 of the Texas Rules of Civil Procedure, and instead only filed a notice with the district clerk indicating that she had made a request for findings of fact, but without indicating that the findings were past due. *See* TEX. R. CIV. P. 297 (if the trial court fails to file timely findings of fact and conclusions of law, the party making the request shall, within thirty days after filing the original request, file with the clerk and serve on all other parties a "Notice of Past Due Findings of Fact and Conclusions of Law…"); *see also* TEX. FAM. CODE ANN. § 6.711(b) (West Supp. 2017) (requests for findings in family law cases must conform to the Texas Rules of Civil Procedure). Further, Suhey did not raise the trial court's failure to issue findings as a separate issue in her appeal and did not provide any briefing on the issue. We therefore do not consider this as an issue to be considered on appeal. *See* TEX. R. APP. P. 38.1(f) (appellant's brief must state concisely all issues or points presented for review); *see also Milteer v. Western Rim Corp*., 303 S.W.3d 334, 336 (Tex. App.—El Paso 2009, no pet.) (failure to adequately brief issue on appeal precludes appellate review).

109).

## Principles of Characterization

Community property consists of all property, other than separate property, acquired by either spouse during the marriage. TEX. FAM. CODE ANN. § 3.002 (West 2006); *see also Barnett v. Barnett,* 67 S.W.3d 107, 111 (Tex. 2001). In turn, separate property includes the property owned or claimed by the spouse before marriage, as well as property acquired during marriage by gift, devise or descent, is separate property. *Rivera v. Hernandez*, 441 S.W.3d 413, 419 (Tex. App.—El Paso 2014, pet. denied) (citing TEX. FAM. CODE ANN. § 3.002).

Under the Texas Family Code, any "[p]roperty possessed by either spouse during or on dissolution of marriage is presumed to be community property." TEX. FAM. CODE ANN. § 3.003(a) (West 2006); *see also Pearson v. Fillingim*, 332 S.W.3d 361, 363 (Tex. 2011) (per curiam); *Rivas v. Rivas*, 452 S.W.3d 49, 54 (Tex. App.—El Paso 2014, no pet.); *Rivera*, 441 S.W.3d at 418–20 (citing *Tate v. Tate,* 55 S.W.3d 1, 4 (Tex. App.—El Paso 2000, no pet.)). This presumption is rebuttable, but in order to overcome the presumption, a spouse claiming assets as separate property has the burden of tracing and clearly identifying property claimed as separate property. *Pearson,* 332 S.W.3d at 363; *see also McKinley v. McKinley,* 496 S.W.2d 540, 543 (Tex. 1973); *Warriner v. Warriner*, 394 S.W.3d 240, 247 (Tex. App.—El Paso 2012, no pet.). In addition, the Family Code requires that the party attempting to overcome the presumption must do so by "clear and convincing" evidence. *Pearson,* 332 S.W.3d at 363 (citing TEX. FAM. CODE ANN. § 3.003(b)). The Family Code defines "clear and convincing" evidence as meaning the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014); *see also Garza v. Garza*, 217 S.W.3d 538, 548 (Tex. App.—San Antonio 2006, no pet.). When the

10

character of the property is in doubt, Texas courts have held in favor of the community estate. *Warriner*, 394 S.W.3d at 247 (citing *Ellebracht v. Ellebracht,* 735 S.W.2d 658, 659 (Tex. App.—Austin 1987, no writ)); *see also Viera v. Viera*, 331 S.W.3d 195, 203–06 (Tex. App.—El Paso 2011, no pet.) (any doubt as to the character of property should be resolved in favor of the community estate).

### The Inception of Title Doctrine

In general, characterization of property is determined by the time and circumstances of its acquisition, often referred to as the "inception of title" doctrine. *Rivera*, 441 S.W.3d at 420 (citing *Scott v. Estate of Scott,* 973 S.W.2d 694 (Tex. App.—El Paso 1998, no pet.)). Inception of title occurs when a party first has a right of claim to the property by virtue of which title is finally vested. *Rivera,* 441 S.W.3d at 420; *see also John Hancock Mut. Life Ins. Co. v. Bennett*, 133 Tex. 450, 128 S.W.2d 791, 795 (1939). *Winkle v. Winkle,* 951 S.W.2d 80, 88 (Tex. App.—Corpus Christi 1997, writ denied). In accordance with this doctrine, if the inception of title predated the marriage, then the property may be characterized as separate property, but if the inception of title occurred after the marriage began, then the property is generally considered to be community property. *Willett v. Rodriguez,* No. 03-16-00084-CV, 2017 WL 2417831, at *2 (Tex. App.—Austin June 2, 2017, pet. denied) (mem. op., not designated for publication) (citing TEX. FAM. CODE ANN. § 3.003(a)); *Tarver v. Tarver*, 394 S.W.2d 780, 783 (Tex. 1965).

However, even property purchased during the marriage may be considered separate property if the evidence clearly demonstrates that it was purchased with separate property funds. *Rivas*, 452 S.W.3d at 54 (where an asset is purchased during marriage with monies traceable to a spouse's separate estate, the asset may appropriately be characterized as separate property); *see also Rivera*, 441 S.W.3d at 419–20; *Phillips v. Phillips*, 296 S.W.3d 656, 674 (Tex. App.—El Paso

11

2009, pet. denied). In order to demonstrate that property was purchased with separate property funds during the course of marriage, the party claiming the property as his separate property shoulders the burden of tracing the source of the funds used to purchase the property, and must establish by clear and convincing evidence that the property used to make the purchase was his separate property. *Rivera*, 441 S.W.3d at 425; *Warriner,* 394 S.W.3d at 247. Further, in order to satisfy this burden, courts typically require the party to present some form of documentary evidence to support his claim, and the party's mere testimony that separate property was used to purchase the property is insufficient without some form of corroboration. *See, e.g., Warriner,* 394 S.W.3d at 248 (citing *Viera*, 331 S.W.3d at 207); *see also Graves v. Tomlinson,* 329 S.W.3d 128, 139 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (the clear and convincing evidence standard is generally "not satisfied by testimony that property ... is separate property when that testimony is contradicted or unsupported by documentary evidence tracing the asserted separate nature of the property"); *Zagorski v. Zagorski,* 116 S.W.3d 309, 316 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (mere testimony that property was purchased with separate property funds, without any tracing of the funds, is generally insufficient to rebut the community presumption).

### The Memphis Avenue Property was Community Property

As set forth above, the undisputed evidence at the hearing in the present case demonstrated that the parties purchased the Memphis Avenue property from Angelo's mother in 2006 during the course of their marriage. Pursuant to the inception of title doctrine, it is therefore presumptively characterized as community property, and it was Angelo's burden to prove by clear and convincing evidence that it was purchased with separate property if he wished to claim the property as his separate property. We find no such evidence in the record.

In particular, we note that the warranty deed that Angelo's mother issued upon the sale of the Memphis Avenue property indicated that the property was being granted to Angelo and Suhey as husband and wife, in consideration for an undisclosed amount of "cash" and a "note" in the principal amount of $60,000. The source of the "cash" is not demonstrated, and although Angelo testified at trial that a down payment was made on the property, he made no attempt to trace the source of the cash to any separate property funds. Without any evidence to the contrary, we must therefore follow the presumption that the cash came from a community property source.

As well, we find it significant that the remainder of the purchase price of the property was financed using borrowed funds, i.e., the Original Note that was executed by the parties and made payable to Angelo's mother. In general, an asset that is purchased on borrowed funds during the course of a marriage is presumptively community in character, as it is presumed that credit was extended to the community for the purchase. *See Newberry v. Newberry,* 351 S.W.3d 552, 559 (Tex. App.—El Paso 2011, no pet.); *see also Richardson*, 424 S.W.3d at 697 (recognizing that the community property presumption applies not only to assets but to liabilities, as well, and that any debt acquired by either spouse during marriage is presumed to be procured on the basis of community credit); *Viera,* 331 S.W.3d at 204 (recognizing that the community property presumption applies to both assets and liabilities). A spouse attempting to rebut this presumption bears the burden of doing so by clear and convincing evidence. *Sprick*, 25 S.W.3d at 17 (McClure, J., concurring) (citing Tex. Fam. Code Ann. § 3.003(b)); *see also Jurek v. Couch–Jurek,* 296 S.W.3d 864, 874 (Tex. App.—El Paso 2009, no pet.) (recognizing that a spouse may overcome this presumption by establishing an express agreement on the part of the lender to look solely to the separate estate of the purchasing spouse for satisfaction of the indebtedness). Angelo, however, presented no evidence to attempt to rebut this presumption, and we must therefore follow the

13

presumption that the Memphis Avenue property was purchased using both community credit and community funds, and that it was therefore community property.

**The Payments on the Original Note did not Transform the Ownership of the Property**

Angelo, however, argues that he used his separate property—from the proceeds of the sale of his insurance agency—to pay off the Original Note on the Memphis Avenue property before the property was sold to Diaz. He contends that the trial court therefore properly characterized the Diaz Note as being his separate property. We disagree with Angelo's argument for several reasons.

First, we note that the Original Note was paid off, at least in part, using community funds. As set forth above, the undisputed evidence at the hearing revealed that the Original Note on the Memphis Avenue property at the time Angelo and Suhey purchased it in November of 2006, was $60,000. The undisputed evidence further revealed that the amount owed on the note in 2010, prior to the time it was paid off, was $43,933. Therefore, during that four-year period of time, the Original Note was paid down by approximately $16,000. However, because Angelo made no attempt to demonstrate that this $16,000 of debt repayment came from his separate property, there is no evidence to demonstrate the source of those payments. We must therefore presume that the first $16,000 in payments came from community sources.

Second, it is unclear whether community or separate funds were used to pay off the balance of the Original Note. Although Angelo testified that the remaining payment on the Original Note came from the proceeds of the sale of his insurance agency, which he claimed as separate property, not all funds received from this sale qualified as separate property given the timing of the sale. The record indicates that Angelo worked at the insurance agency for six years during the course of the marriage before he sold it. Therefore, the community arguably had a claim for reimbursement in exchange for the time, talent and labor that Angelo expended on the business

14

during that time. *See generally Vallone v. Vallone*, 644 S.W.2d 455, 458 (Tex. 1982) (recognizing that the community may therefore be entitled to a reimbursement when a spouse expends his time, labor and talents on improving his separate property business during the course of a marriage). Although Suhey did not request any reimbursement on behalf of the community estate, we find it significant that the trial court categorized the remaining proceeds from the sale of the insurance agency, i.e., the $41,000 in the bank account awarded to Angelo in the divorce decree, as being community property. Further muddying the waters on this issue is Suhey's testimony that she believed the payments on the Original Note came from other unidentified community property sources. Accordingly, the record is conflicting on the question of whether Angelo used separate property to pay off the remaining balance on the Original Note.

However, for purposes of determining the nature of the property, we need not decide whether Angelo did in fact use his separate property to pay off the Original Note, as any such payment would not transform the nature of the Memphis Avenue property into Angelo's separate property. Instead, the Memphis Avenue property was the parties' community property based on the inception of title doctrine, and Angelo's use of separate property funds to help pay off the Original Note on the property would not alter the characterization of the property itself; instead, as discussed in more detail below, any separate property payments would only create a potential claim for reimbursement by Angelo against the community estate.[3] *See Rivera*, 441 S.W.3d at 424 n.2 (a claim for reimbursement does not affect the rule of inception of title under which the character of property is determined at the time the right to own or claim the property rises, nor

---

[3] In particular, the Family Code expressly provides that a claim for reimbursement may arise in situations in which a spouse has used separate property funds to reduce the principal amount of a debt that was incurred during a marriage, which was secured by a lien on property, and was incurred for the acquisition or capital improvement of property. TEX. FAM. CODE ANN. § 3.402(a)(5) (West Supp. 2017).

15

does it create an ownership interest in the property); TEX. FAM. CODE ANN. § 3.404(b) (West Supp. 2017) (a claim for reimbursement does not create an ownership interest in property, but does create a claim against the property of the benefited estate by the contributing estate); *see also Burton v. Bell,* 380 S.W.2d 561, 564 (Tex. 1964) (the right of reimbursement is not an interest in property or an enforceable debt, per se). As such, we conclude that the Memphis Avenue property was community property at the time the parties sold it to Diaz.

Similarly, we also conclude that when the parties sold the Memphis Avenue property to Diaz during the course of their marriage, the note that Diaz gave to both Angelo and Suhey, as husband and wife, was community property as well. When community property is sold during the course of a marriage, and a promissory note is taken back on the property, the note is presumed to be community property as well. *See, e.g., Coleman v. Winn-Coleman, Inc.,* 110 S.W.3d 104, 109 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (promissory note that was acquired by husband during marriage in exchange for his interest in property that was also acquired during marriage was presumptively considered community property); *Wood v. Spray,* 297 S.W.2d 872, 873 (Tex. Civ. App.—Amarillo 1957, no writ) (promissory note that was taken upon sale of community property was community property as well); *Welch v. Brown,* 96 S.W.2d 672, 674 (Tex. Civ. App.—Austin 1936, no writ) (holding that the sale proceeds of certain community property were also community property subject to community debts). Angelo presented no evidence to rebut this presumption, and we therefore conclude that the Diaz Note was a community property asset, and that the trial court erred in characterizing it as Angelo's separate property.

### Harm Analysis

Our analysis does not stop here, as even when a trial court errs in characterizing property, this is not an automatic cause for reversal of a trial court's division of the parties' property. In

Texas, a trial court has broad discretion in dividing community property, and the court is not required to divide the property equally; instead, the estate must be divided in a manner that the court deems is just and right, having due regard for the rights of each party. *See* TEX. FAM. CODE ANN. § 7.001 (West 2006); *Richardson*, 424 S.W.3d at 696. Therefore, when a trial court mischaracterizes community property as a spouse's separate property, an appellate must conduct a harm analysis, and may only find reversible error if the mischaracterization rendered the overall division of property an abuse of discretion.[4] *Rivera*, 441 S.W.3d at 425–26; *see also Long v. Long,* 234 S.W.3d 34, 37 (Tex. App.—El Paso 2007, pet. denied). An abuse of discretion occurs when the mischaracterization resulted in a significantly disproportionate division of the marital estate, and in such case, courts have generally held that a remand is necessary to allow the trial court to make a new division of the property. *See e.g., Knight v. Knight,* 301 S.W.3d 723, 733 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (remand was necessary to effect a new division of the parties' community estate, where trial court's error reduced the wife's separate estate is by two-thirds, thereby presumably impacting the trial court's determination of a just and equitable division of the community estate); *Boyd v. Boyd,* 131 S.W.3d 605, 618 (Tex. App.—Fort Worth 2004, no pet.) (where trial court mischaracterized $294,456.52 as separate property in making its division, the resulting division was "extremely disproportionate" in favor of the husband thereby necessitating a remand to the trial court for a new division of the community estate); *Zeptner v. Zeptner*, 111 S.W.3d 727, 741 (Tex. App.—Fort Worth 2003, no pet.) (where trial court's errors

---

[4] We note that there is only one instance in which a trial court's mischaracterization of property can be characterized as reversible error as a matter of law, and that is when the trial court mistakenly characterizes a spouse's separate property as being community property and awards it to the other spouse. *Long*, 234 S.W.3d at 38. In that instance, it is unnecessary to show harm because divestiture of separate property is reversible error as a matter of law. *Id.* (citing *Eggemeyer v. Eggemeyer,* 554 S.W.2d 137, 140 (Tex. 1977); *In re Marriage of Morris,* 12 S.W.3d at 881); *see also Rivera,* 441 S.W.3d at 425–26. Because we are not faced with this factual scenario, we must instead conduct a harm analysis.

17

resulted in husband receiving only 25 percent to 30 percent of a community estate worth approximately $311,000, court of appeals remanded the matter to the trial court for a new division of the community estate*)*; *In re Marriage of Case,* 28 S.W.3d 154, 161–62 (Tex. App.—Texarkana 2000, no pet.) (where entire community estate was valued at approximately $315,000, the trial court's combined errors amounting to over one-third of that amount prevented a proper division and thus were harmful, requiring a remand); *see also Jacobs v. Jacobs*, 687 S.W.2d 731, 733 (Tex. 1985) ("Once reversible error affecting the 'just and right' division of the community estate is found, the court of appeals must remand the entire community estate for a new division."); *see also Garza*, 217 S.W.3d at 549.

On the other hand, if the mischaracterization of the property had only a *de minimis* effect on the trial court's just and right division, then we need not remand the cause to the trial court. *Garza,* 217 S.W.3d at 549 (citing *Boyd,* 131 S.W.3d at 617; *Robles,* 965 S.W.2d at 615); *see also Magill v. Magill,* 816 S.W.2d 530, 533 (Tex. App.—Houston [1st Dist.] 1991, writ denied) (a mere mischaracterization of property does not require reversal if the division is otherwise equitable). It is the appellant's burden to demonstrate that because of the mischaracterization, the overall division of property constituted an abuse of discretion, and that a remand is necessary. *Long*, 234 S.W.3d at 38; *see also In re Marriage of Moncey*, 404 S.W.3d 701, 706 (Tex. App.—Texarkana 2013, no pet.) (before an appellate court will disturb a trial court's property division, the appellant must demonstrate that the trial court's mischaracterization of property resulted in a clear abuse of discretion in terms of a division that was "manifestly unjust and unfair").

In the present case, Suhey argues that the trial court's mischaracterization of the Diaz Note cannot be considered harmless, pointing out that the Diaz Note was valued at $50,000, which constituted a significant portion of the entire community estate, and therefore did not have a "*de*

18

*minimis* effect" on the division of the property. Angelo, however, does not address the issue of harm.

In determining whether the mischaracterization of the Diaz Note resulted in a significantly disproportionate division of the marital estate, we are somewhat hindered because the trial court did not issue findings of fact with respect to each of the major assets that comprised the community estate. The parties, however, presented undisputed evidence regarding the value of the primary assets awarded as community property, not separate, which we may consider for the limited purpose of conducting our harm analysis.[5] Other items were listed but were divided in kind and no values were stated. The division of the marital estate included the following:

1) **The Community's Interest in the Findley Property**: The undisputed evidence established that the community's interest in this property was $7,000. Angelo testified the property was purchased in 2009 for $55,000. He invested $20,000 of inheritance he received from his mother's estate. After deducting his $20,000 inheritance, the net is $35,000 but there is a balance owed of $28,000. The community interest was calculated as $35,000 less $28,000. The trial court appears to have agreed with Angelo's assessment, as it awarded Suhey $3,500 as her share of the community's interest in this property.

2) **The Community's Interest in the Piedras Property**: The undisputed evidence established that the community's interest in this property was $37,000. The trial court, however, awarded Suhey $21,500 for her share of the community interest in the Piedras property, thereby establishing that the community's interest in the property was $43,000.

3) **The Community's Interest in the Altura Property**: The undisputed evidence established that the community's interest in this property was $8,000. The trial court appears to have agreed with this assessment, as it awarded Suhey $4,000 as her share of the community's interest in this property.

4) **The Bank Account in Angelo's Name**: The undisputed evidence established that there was approximately $41,000 in this bank account. No

---

[5] We note that the issue of whether the trial court properly categorized and/or valued these items is not before this Court on appeal. We therefore do not express any opinion regarding whether the trial court's characterization of these items was proper.

other bank account was mentioned.

5) **The Retirement Account in Angelo's Name**: The undisputed evidence established that the value of this retirement account was approximately $132,000. No other retirement account was mentioned.

Based on the evidence presented at trial, together with the trial court's calculations in the final decree, we conclude that the total value of the community's primary assets, and excluding in kind assets without stated values, was approximately $225,000. Further, the undisputed evidence at trial established that the Diaz Note at the time of trial was valued at $50,000. With inclusion of the Diaz Note, the marital estate should have been valued at $275,000, rather than $225,000. When properly considered, the Diaz Note accounts for almost 18 percent of the total estate. As for the division between the parties, Angelo was given far more of the marital estate and Suhey only receiving $29,000 of the total community assets. Thus, we conclude that this mischaracterization, which also favored Angelo, resulted in a significantly disproportionate division of the parties' property.

In reaching this conclusion, we recognize that Angelo may have a claim for reimbursement for any separate property that he may have used to pay down the Original Note on the Memphis Avenue property. However, we note that the right to reimbursement is not automatic, and the party seeking reimbursement has the burden of pleading and proving that the expenditures and improvements were made and that they are reimbursable. *Phillips*, 296 S.W.3d at 664 (citing *Vallone*, 644 S.W.2d at 459); *see also Garcia,* 170 S.W.3d at 650 (the party claiming the right of reimbursement has the burden of proof). Further, a claim for reimbursement is purely an equitable claim and the decision of whether to allow a claim for reimbursement is left to the sound discretion of the trial court. *See Phillips*, 296 S.W.3d at 664; *see also Vallone*, 644 S.W.2d at 458; *Garcia,* 170 S.W.3d at 649 (a decision to deny a claim for reimbursement is reviewed on appeal for abuse

20

of discretion); TEX. FAM. CODE ANN. § 3.402(b) (West Supp. 2017) (the court shall resolve a claim for reimbursement by using equitable principles, including the principle that claims for reimbursement may be offset against each other if the court determines it to be appropriate). As the trial court did not have a claim for reimbursement before it and therefore made no ruling on any such claim, we do not take into consideration Angelo's right to reimbursement in our harm analysis.

Accordingly, based on the record before us, we conclude that the trial court's error in mischaracterizing the Diaz Note was not harmless, and that a remand is necessary to allow the trial court to make a new just and equitable division of the parties' community property, taking into consideration the proper characterization of the Diaz Note. Suhey's Issue One is sustained.

## ISSUE TWO: THE CHILD SUPPORT ORDER

In her second issue, Suhey contends that the trial court abused its direction in not considering two community assets, the $132,000 in retirement funds that the trial court awarded to Angelo, as well as the $41,000 in a bank account that it also awarded to Angelo, in calculating the monthly child support obligation. Suhey's argument on this issue is two-fold. First, she argues that the trial court should have considered these accounts as net resources for the support of the child under the statutory guidelines set forth in the Texas Family Code, or alternatively, that the trial court should have taken these accounts into consideration as additional factors in determining whether to deviate from those guidelines.

Before addressing the merits of Suhey's argument, we note that on remand, the trial court will be tasked with making a just and right division of the parties' community property with the Diaz Note included, which may, in turn, impact Angelo's rental income. In particular, we note that Angelo testified at the hearing that he was relying on the income from the various properties

21

he was awarded in estimating his future net resources, and, as set forth below, it appears that the trial court relied, at least in part, on this estimate in calculating child support. At this juncture, however, our review must be based on the arguments presented and the record as it is in its present state.

**Statutory Child Support Guidelines**

The Texas Family Code provides that when, as here, the parties have one child and the obligor's monthly net resources are not greater than $7,500 a month, the trial court shall presumptively base its child support award on 20 percent of the obligor's net resources. TEX. FAM. CODE ANN. § 154.125 (West Supp. 2017). In turn, the Code provides that an obligor's net resources include all wages, self-employment income, net rental income, and "all other income actually being received, including severance pay, retirement benefits, pensions, trust income, annuities, capital gains, social security benefits …." *Id*. § 154.062(b)(5) (West Supp. 2017). Net rental income is defined as "rent after deducting operating expenses and mortgage payments, but not including noncash items such as depreciation[.]" *Id*. § 154.062(b)(4). The statute further provides that net resources do not include return of principal or capital and accounts receivable. *Id*. § 154.062(c)(1) and (2). In calculating an obligator's net resources, the court must also deduct any social security taxes, federal and state income taxes, and expenses for the cost of health insurance, dental insurance, or cash medical support for the obligor's child ordered by the court. *Id*. § 154.062(d)(5) (West 2014).

The Code further provides that the statutory guidelines are "presumed to be reasonable," and an order of child support conforming to those guidelines is presumed to be in the best interest of the child. *Id*. § 154.122 (West 2014). However, a trial court may determine that the application of the guidelines would be unjust or inappropriate under the circumstances, and it may order child

22

support in an amount other than that established by the guidelines if "the evidence rebuts the presumption that application of the guidelines is in the best interest of the child and justifies a variance from the guidelines." *Id*. §§ 154.122, 154.123 (West 2014). In determining whether the application of the guidelines would be unjust or inappropriate under the circumstances of a particular case, the Code further provides that the trial court "shall consider," among other things, the age and needs of the child, the ability of the parents to contribute to the support of the child, the "financial resources available for the support of the child," and "any other reason consistent with the best interest of the child, taking into consideration the circumstances of the parents." *Id*. §154.123(a)(b); *see also In re J.C.K.,* 143 S.W.3d 131, 136 (Tex. App.—Waco 2004, no pet.) (recognizing that a court may vary from the child support guidelines by considering the factors set forth in the Family Code); *In re B.R.G.,* 48 S.W.3d 812, 818–19 (Tex. App.—El Paso 2001, no pet.) (after determining the obligor's net resources and the percentage of net resources the obligor would pay under the guidelines, the trial court may consider whether any additional factors would justify varying from the guidelines).

When a trial court deviates from the statutory guidelines, it is required to make certain findings to support its conclusion that the application of the guidelines would be unjust or inappropriate. TEX. FAM. CODE ANN. § 154.130 (West Supp. 2017). In particular, the trial court must set forth the net resources of the obligor, and if evidence is provided, the resources of the obligee, the percentage applied to the obligor's net resources, and the specific reasons that the court has deviated from the statutory guidelines. *Id.*

### Standard of Review

A trial court has the discretion to set child support within the statutory guidelines of the Family Code and we review its determination under an abuse of discretion standard. *In re B.R.G.,*

23

48 S.W.3d at 818*; see also Stringfellow v. Stringfellow,* 538 S.W.3d 116, 118 (Tex. App.—El Paso 2017, no pet.) (citing *In re M.A.S.*, 233 S.W.3d 915, 921 (Tex. App.—Dallas 2007, pet. denied)). Therefore, a determination of child support will not be reversed unless the complaining party can show a clear abuse of discretion. *In re B.R.G.*, 48 S.W.3d at 818. As in other situations, the test for abuse of discretion in reviewing a child support order is whether the trial court acted without reference to any guiding rules or principles. *Worford,* 801 S.W.2d at 109; *see also Stringfellow*, 538 S.W.3d at 118 (a trial court only abuses its discretion if its decision is arbitrary or unreasonable, or if it was made without reference to guiding rules or principles).

In challenging a child support order, an appellant may challenge, among other things, the sufficiency of the evidence to support a finding of net resources. *See Knight v. Knight,* 131 S.W.3d 535, 539 (Tex. App.—El Paso 2004, no pet.); *see also Howe v. Howe*, 551 S.W.3d 236, 250 (Tex. App.—El Paso 2018, no pet.). We will affirm the trial court's child support order so long as there is some evidence of a substantive and probative character to support the trial court's decision. *See Worford,* 801 S.W.2d at 109; *see also In re B.R.G.*, 48 S.W.3d at 818; *Knight*, 131 S.W.3d at 539 (citing *Hodson v. Keiser,* 81 S.W.3d 363, 367 (Tex. App.—El Paso 2002, no pet.)).

**The Trial Court's Calculation of Angelo's Net Resources**

As a preliminary matter, we note that it is not entirely clear how the trial court calculated Angelo's child support obligations, as the trial court made no findings of fact in that regard. In her brief, Suhey contends that the trial court based its child support order on a "minimum wage" calculation pursuant to section 154.062 of the Family Code. This, however, does not appear to be the case.

The Code provides that "[i]n the absence of evidence of a party's resources, as defined by section 154.062(b), the court shall presume that the party has income equal to the federal minimum

24

wage for a 40-hour week to which the support guidelines may be applied." TEX. FAM. CODE ANN. § 154.068(a) (West Supp. 2017). As set forth above, however, in the present case, Angelo presented uncontradicted testimony regarding his past income, as well as his projected future income at the parties' hearing. Therefore, because the trial court was not faced with a situation in which there was an "absence" of evidence of Angelo's net resources, it would have been improper for the trial court to set child support using a minimum wage earnings calculation. *See generally* TEX. FAM. CODE ANN. § 154.068(a); *see also In re B.R.G.,* 48 S.W.3d at 819 (calculating child support based on minimum wage, where no evidence was presented of husband's net resources).

Further, we note that at the hearing, neither party discussed the possibility of setting child support based on a minimum wage calculation at trial, and neither party requested that the trial court do so. Instead, both parties focused on arguing what Angelo's net resources were, and during the hearing, both parties expressly asked the trial court to set Angelo's child support obligations at 20 percent of his net resources for the parties' one eligible child. And finally, and perhaps of most importance, we note that a calculation based on minimum wage earnings in 2016 would have placed the child support amount at approximately $227, rather than the $263.72, as ordered by the trial court.[6]

We further note that a child support order in the amount of $263.72 a month, when calculated based on the statutory guidelines for one child, or 20 percent of an obligor's net resources, equates to a net income of $1,318.60 a month, or $15,823.20 a year. Although Angelo's

---

[6] Using the Texas Office of Attorney General's Child Support Interactive calculator, the gross income for a minimum wage worker making $7.25 an hour (the federal minimum wage in 2016) working 40 hours a week is $1,256.67. https://csapps.oag.texas.gov/monthly-child-support-calculator; *see also Marquez v. Moncada*, 388 S.W.3d 736, 740 (Tex. App.—Houston [1st Dist] 2012, no pet.) (similarly calculating a full-time minimum wage worker's gross income at $1,256.67). In turn, under current guidelines, the OAG calculates that a full-time minimum wage worker's net resources is $1,134.87, and that the worker's monthly child support obligation for one child is $226.97.

testimony and evidence regarding his projected future income was less than precise, it appears to support the trial court's decision to order child support in that amount. *See generally In re J.C.K.,* 143 S.W.3d at 139 (citing *Norris,* 56 S.W.3d at 341–42; *Mai v. Mai,* 853 S.W.2d 615, 618–19 (Tex. App.—Houston [1st Dist.] 1993, no writ) (trial court may calculate child support based on imprecise information)). At the hearing, Angelo testified that he estimated his future net income to be in the range of $12,000 to $13,000 a year based on the income he anticipated receiving from rental income. Further, Angelo testified that he typically works a part-time job doing contract work for an insurance agency for three weeks out of the year, but that he worked an additional four weeks the year before the hearing, thereby increasing his income by approximately $4,000 a year. Accordingly, based on this evidence, which was not contradicted by Suhey, Angelo's projected annual future income, from both his properties and his part-time work, after the divorce would be in the range of $16,000 to $17,000, an amount that would support the trial court's order of child support.

As indicated above, however, on appeal, Suhey contends that the trial court should not have based its child support order simply on the income Angelo projected he would receive from the above sources, and should have also considered the funds contained in the retirement and bank accounts that were awarded to Angelo, as either (1) "net resources" under section 154.062(b)(5) of the Family Code, or alternatively, as (2) additional "factors" to be considered in deviating from the statutory guidelines set forth in the Code. We review each argument separately.

**Angelo's Retirement and Bank Accounts were not Net Resources under
Section 154.062 of the Family Code**

*The Retirement Account*

As set forth above, section 154.062 of the Family Code provides that income from

retirement accounts can be considered a net resource, but clearly states that the trial court should only consider retirement income as a net resource when it is "actually being received[.]" TEX. FAM. CODE ANN. § 154.062(b)(5). Suhey acknowledges that the undisputed evidence established that Angelo was *not* actually receiving any income from the retirement account in his name, as he had not yet started taking distributions from the account, and he did not intend to do so until he reached "retirement age." Suhey argues, however, that Angelo was able to draw from this account "on a monthly basis any time he wants," and that his retirement account was therefore "unconditionally available" to him. Suhey contends that the trial court therefore should have concluded that the retirement account had been "received" by Angelo, thereby making it a "net resource" under the Family Code. We disagree.

Although Angelo referred to the retirement account at various times at trial as being either an IRA, an annuity, or a 401k, both parties refer to it as a 401k in their briefs, and we therefore treat it as such. As Angelo points out, however, he was only 54 at the time of trial, and he had therefore not yet reached the age at which he qualified for distributions from a 401k or other similar retirement account without incurring a penalty. 26 U.S.C.A. § 72(t) (West) (early distributions taken before the age of 59 ½ from qualified retirement plans are subject to a 10% penalty). Suhey has not cited any authority, nor are we aware of any, that authorize a court to consider funds held in an undistributed retirement account as qualifying as retirement income actually being received. As such, we conclude that the retirement account itself could not be considered a net resource under section 154.062 of the Family Code. *See* TEX. FAM. CODE ANN. § 154.062(b)(5).

### The Bank Account

We also disagree with Suhey's argument that the trial court should have considered Angelo's bank account as a "net resource" under section 154.062 of the Code. Suhey cites no

27

authority for the proposition that such an account should be considered a "net resource" under the Code, and instead makes broad arguments that the trial court should have considered the account as "received" by Angelo, arguing that the money was "just there sitting in the bank," was not "legally tied up," and was in Angelo's possession. There are several problems with this argument.

As a preliminary matter, we note that Suhey did not raise this argument in the trial court. While Suhey did argue that Angelo's retirement account should be considered as a net resource in calculating child support, she did not similarly argue that the funds in Angelo's bank account should be considered as such. Suhey therefore did not properly preserve this issue for appeal. *See generally* TEX. R. APP. P. 33.1(a) (as a prerequisite to presenting a complaint for appellate review, the record must show that Appellant made the complaint to the trial court by a timely request, objection, or motion).

Moreover, even if we were to consider this issue on appeal, we agree with Angelo that the money in his bank account cannot be considered "income" for purposes of determining net resources under the statutory guidelines. As the Texas Supreme Court has recognized, the term "income" includes all forms of payment received periodically from "employment, business, investments, royalties, gifts, and the like." *Loya v. Loya*, 526 S.W.3d 448, 452 (Tex. 2017) (citing *Income*, Black's Law Dictionary (10th ed. 2014)). The final decree shows that all sums under the sole control of Angelo, such as the bank account at issue, was included in the division of the marital estate and not characterized as one of the recognized forms of income paid periodically. At most, any income generated from the bank account in the form of interest payments could be considered as a net resource for purposes of determining Angelo's income under the statutory guidelines set forth in section 154.062 of the Family Code, but not the principal funds contained in the bank account itself.

28

**The Retirement and Bank Accounts as Additional Resources under Section 154.123 of the Family Code**

Suhey also appears to be contending that even if Angelo's bank and retirement accounts could not be considered as "net resources" under section 154.062 of the Family Code, the trial court should have considered these accounts as "factors" in deviating from the statutory guidelines pursuant to sections 154.122 and 154.123 of the Family Code. TEX. FAM. CODE ANN. §§ 154.122, 154.123.

As a preliminary matter, we note that Suhey did not ask the trial court to deviate from the statutory guidelines at the hearing; to the contrary, Suhey and her attorney expressly asked the court to set child support under the statutory guidelines, calculating child support at 20 percent of Angelo's net resources for one child, and never argued that there was any evidence in the record to rebut the presumption that the statutory guidelines were not in the best interest of the parties' child. At the hearing, the only issue that Suhey raised was how the trial court should determine Angelo's net resources, arguing that: (1) the calculation should be based on Angelo's 2014 and 2015 income; and (2) Angelo's retirement account should be considered as a net resource under the statutory guidelines. Conversely, there is no mention in the trial court by either party regarding whether the trial court should deviate from the statutory guidelines in assessing child support.

Moreover, Suhey failed to establish that the trial court abused its discretion in failing to deviate from the statutory guidelines in setting child support. As set forth above, under sections 154.122 and 154.123 of the Code, a trial court may only deviate from the statutory guidelines if the trial court determines that application of the guidelines would be "unjust or inappropriate," and if the evidence rebuts the presumption that application of the statutory guidelines was in the best interest of the child. TEX. FAM. CODE ANN. §§ 154.122, 154.123. As the party attempting to

establish that the trial court abused its discretion in not deviating from the guidelines, Suhey shouldered the burden of bringing forth a record to establish such an abuse. *See, e.g., In re P.C.S.*, 320 S.W.3d 525, 541 (Tex. App.—Dallas 2010, pet. denied) (citing *Stallworth v. Stallworth,* 201 S.W.3d 338, 349 (Tex. App.—Dallas 2006, no pet.) (party complaining of abuse of discretion has burden to bring forth record showing such abuse); *see also* TEX. R. APP. P. 44.1, 47.1 (judgment may not be reversed on appeal unless error complained of probably caused rendition of improper judgment).

In her brief, Suhey complains in general terms that the child support order was somehow unfair or unjust because she has to work two jobs, one of which is cleaning offices, while Angelo had voluntarily retired and was only working three to four weeks a year. As set forth above, however, Suhey did not provide the court with evidence of relevant factors such as child care expenses needed to maintain gainful employment, additional amounts she believed were necessary to adequately provide for the child, or other evidence establishing the child's needs would not be met taking into consideration the circumstances of both parents.[7] We therefore conclude that she failed to meet her burden of establishing that child support set in accordance with the statutory guidelines was not in the best interest of the child, or that it would be unjust or inappropriate to apply the statutory guidelines. Accordingly, we conclude that the trial court did not abuse its discretion by failing to deviate from the statutory guidelines. Suhey's Issue Two is overruled.

---

[7] We note that section 154.123 of the Code provides that a trial court may consider as an additional factor in deviating from the statutory guidelines, the "earning potential of the obligee if the actual income of the obligee is significantly less than what the obligee could earn because the obligee is intentionally unemployed or underemployed[.]" TEX. FAM. CODE ANN. § 154.123; *see also Pharo*, 711 S.W.2d at 284 (the court may take a parent's earning potential into account when determining the amount of child support the parent must pay, as a parent who is qualified to obtain gainful employment cannot evade his or her support obligation by voluntarily remaining unemployed). Although Suhey generally argued that Angelo was able to work but chose not to, she did not request a finding of intentional underemployment from the trial court.

30

## CONCLUSION

We affirm the trial court's award of child support under the record presented to us. However, we reverse the trial court's order with regard to its mischaracterization of the Diaz Note as Angelo's separate property, and we remand the matter for a just and equitable division that includes the Diaz Note as part of the marital estate.


GINA M. PALAFOX, Justice

September 28, 2018

Before McClure, C.J., Rodriguez, and Palafox, JJ.

31